CARAWAY, J.
11Following a jury trial, Tommy Goosby was convicted of one count of possession of a firearm by a convicted felon. He was subsequently adjudicated a second felony offender and sentenced to 20 years at hard labor. Goosby appeals his conviction and sentence. We affirm.

Facts

On July 17, 2009, Tommy Goosby was charged by amended bill of information with one count of possession of a firearm by a convicted felon in violation of La. R.S. 14:95.1.[1] The charge arose out of a gunfight that occurred between Goosby and R.D., an armed juvenile, on the afternoon of April 24, 2009. R.D. and three other juveniles had come to the apartment that Goosby sometimes shared with his girlfriend to discuss a stolen bike. It is unclear whether Goosby was in the apartment at the time.
Video evidence obtained from a security camera shows that the juveniles stayed at the apartment complex only three minutes. As the group was leaving the apartment as seen on the video, Goosby charged at R.D. who was armed with a gun. While Goosby attempted to pull something from his waist, R.D. pointed a gun at him. Goosby then pulled a gun on R.D. who, along with the other boys, fled the apartment complex through a gate. After Goosby retreated out of view of the camera, shots were exchanged between the juveniles and Goosby who were approximately 80|i>yards apart. Two of the three shots fired by Goosby hit two of the juveniles, including R.D., and inflicted serious, non-life threatening, injuries.
After the incident, Goosby and his girlfriend fled the scene and traveled to a relative’s house. After witnesses implicated Goosby in the shooting, police sought him out at the relative’s home. Police were unable to locate Goosby, but he turned himself in to police at approximately 10:30 that evening. In initial statements to police, Goosby denied any involvement in the incident. Goosby was arrested and charged as noted above.
*498 After his conviction, the state charged Goosby as a second felony offender based upon a previous 2006 conviction for illegal use of weapons. Goosby filed motions for new trial and judgment notwithstanding the verdict, based upon claims of insufficient evidence, discovery violations by the state including a failure to disclose evidence favorable to Goosby in violation of Brady v. Maryland, 873 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and denial of a fair trial. Those motions were denied. Goosby was adjudicated a second felony offender and sentenced to 20 years. He filed a timely motion for reconsideration of sentence which remains pending. This appeal ensued.

Discussion

On appeal, Goosby argues that although the state presented evidence sufficient to support a conviction for possession of a firearm by a convicted felon, it failed to prove that his possession of the gun was not justified by self-defense.
|sThe standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La. App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 08-0499 (La.11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La.C.Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir. 1/14/09), 1 So.3d 833, writ denied, 09-0310 (La.11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La. App.2d Cir.2/25/09), 3 So.3d 685, unit denied, 09-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When |4the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that defendant was guilty of every essential element of the crime. State v. Sutton, 436 So.2d 471 (La.1983); State v. Speed, 43,786 (La.App.2d Cir.1/14/09), 2 So.3d 582, writ denied, 09-0372 (La.11/6/09), 21 So.3d 299.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Speed, supra; State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004).
At the time of the present offense, La. R.S. 14:95.1(A) made it illegal *499 for a person who had previously been convicted of felony illegal use of weapons or dangerous instrumentalities to possess a firearm or carry a concealed weapon. Nevertheless, when a felon is in imminent peril of great bodily harm, or reasonably believes himself or others to be in such danger, he may take possession of a weapon for a period no longer than is necessary or apparently necessary to use it in self-defense or in defense of others. In such a situation, justification is a defense to the charge of felon in possession of a firearm. State v. Blache, 480 So.2d 304 (La.1985); State v. Goldsmith, 519 So.2d 299 (La.App. 2d Cir.1988); State v. Sanchell, 11-1672 (La.App.4th Cir.10/31/12), 103 So.3d 677. See also, State v. Dabney, 02-0934 (La.4/9/03), 842 So.2d 326. To prove this defense, the defendant must show that the threat of force by another was imminent and apparent and that he had no reasonable alternative but to possess the firearm. State v. Shed, 36,321 (La.App.2d Cir.9/18/02), 828 So.2d 124, writ denied, 02-3123 (La.12/19/03), 861 So.2d 561.
This court has held that the burden of proof of self-defense in a non-homicide case rests upon the defendant. That burden of proof is preponderance of the evidence, not beyond a reasonable doubt. State v. Cheatham, 38,413 (La.App.2d Cir.6/23/04), 877 So.2d 164, writ denied, 04-2224 (La.6/24/05), 904 So.2d 717. A person who is the aggressor or who brings on a difficulty cannot claim the right of self-defense unless he withdraws from the conflict in good faith and in such a manner that his adversary knows or should know that he desires to withdraw and discontinue the conflict. La. R.S. 14:21.
Flight and attempt to avoid apprehension are circumstances from which a trier of fact may infer a guilty conscience. State v. Garner, 45,474 (La.App.2d Cir.8/18/10), 47 So.3d 584, writ not considered, 12-0062 (La.4/20/12), 85 So.3d 1256; State v. Durden, 36,842 (La.App.2d Cir.04/09/03), 842 So.2d 1244, unit denied, 03-1350 (La.11/26/03), 860 So.2d 1131.
The evidence presented by the state included the testimony of two Shreveport police detectives. Detective Rod Johnson, a violent crimes investigator, testified that on April 24, 2009, he was dispatched to the area of 74th and Bernstein Streets in Shreveport. He arrived at the Kang’s Manor | ^Apartments, a large gated apartment complex, where he learned of a verbal altercation which had escalated into gunfire between a group of juveniles and “somebody” in the apartment complex. He acquired knowledge that R.D. and another juvenile had been shot near the intersection of Bernstein and 74th Streets, a residential area. Detective Johnson became aware that shell casings and a gun were found in the area where the juveniles had been shot.
Detective Johnson testified that he continued to the King’s Manor Apartment office where he was advised that there was gun activity that involved apartment 145. He was also informed that a video of an altercation involving the weapons was available. Detective Johnson watched the video and confirmed that weapons were involved in the altercation. Out of welfare concern, he gained access to apartment 145 and found no persons inside. Detective Johnson also made a sweep of the apartment. Upon his exit, he located a 9 mm spent shell casing directly in front of the apartment door.
Detective Johnson then interviewed witnesses, including Lisa Stewart, Goosby’s girlfriend, to learn more about the altercation. From his interviews, he discovered that juvenile subjects including R.D. came to Apartment 145 in an attempt to recover a stolen bike. He learned that Tommy *500 Goosby, aka “Big,” stayed with Stewart in Apartment 145 and was potentially involved in the altercation.
Detective Johnson unsuccessfully attempted to locate Goosby at his last known residence on Fulton Street. He explained that upon his arrival, |7he saw people getting their hair cut. Almost immediately, a black male later identified as Goosby’s brother “took off’ running. Detective Johnson spoke with several of Goosby’s family members who never told him that Goosby was at the house. During the interview, Detective Johnson learned that Goosby had a relationship with R.D. and that the juvenile had visited his house.
Detective Johnson testified that Goosby later voluntarily came to the Shreveport police station wearing different clothes and a different hairstyle than earlier that day. Particularly, he pointed out how the video showed Goosby wearing braids, but that he appeared at the police station with a closely-shaven haircut. Goosby was informed of his rights. In a recorded interview, he denied his presence at the scene of the crime and indicated that he was at the Fulton Street house.
Detective Johnson testified regarding the video. He stated that the camera was positioned to “cover” the southeast gate and show who was coming in and out of the apartment complex from Bernstein Street. He stated that it was “right at that corner of what would be the apartment building 145.” Detective Johnson indicated that he was provided about an hour of tape although the incident in question occurred over a short period of time.
Through the Detective’s testimony, the state introduced the DVD into evidence and played it for the jury. Detective Johnson testified that the video depicted four juveniles walking through the gate in the direction of Apartment 145 at approximately 2:27 p.m., and then walking away back ^through the gate. He stated that one of the juveniles was identified as 13-year-old R.D. Detective Johnson testified that as the juveniles attempted to leave the complex, the video showed Goosby approaching R.D. and quickly making motions with his hand. It also showed R.D. pull out a firearm and point it in the direction of Goosby. Detective Johnson also testified that the video showed Goosby pull out a handgun and point it in the direction of R.D. before all of the juveniles ran away from Goosby. He stated that the shootout occurred a block away and is not featured on the video. He indicated that the video had not been altered in any way and was the same video that he saw in the apartment office on the day of the shooting.[2]
Detective Johnson also testified that in his opinion, the juveniles disengaged from the conflict in moving away from Apartment 145, and that Goosby acted as the aggressor in running after them.
Detective Johnson estimated the gate to be approximately 75 yards from the intersection of Bernstein and 74th Streets. Neighborhood witnesses informed Detective Johnson that the “juveniles pulled weapons, and then the shooting just started.” Detective Johnson guessed that the *501 juveniles would have been approximately 80 yards from Apartment 145 when the shooting started. He stated that the area was heavily populated and traveled at the time of the afternoon that the incident occurred.
| ^Detective Johnson testified that the shell casings found at the corner of Bernstein and 74th Streets were consistent with the Browning Hi-Point semi-automatic pistol recovered at the location where the juveniles were shot. One bullet hole was found in Apartment 145’s exterior “upstairs,” but no pistol was ever located.
On cross-examination, Detective Johnson conceded that the witnesses he interviewed indicated that R.D. fired first, but three shells were found in front of Apartment 145. Detective Johnson did not recall Stewart indicating that anybody had threatened her with a gun. Rather he testified that Stewart indicated that when R.D. asked her if Big was home, “another dude” (referred to as K-9) came around the front of the building and argued with the juveniles. R.D. pulled a gun on the individual who also pulled a gun.[3]
Detective Rod Demery of the Shreveport Police Department Homicide Division testified that when he arrived at the scene the juveniles had been transported to the hospital. He recalled that one of the youths was shot in the chest and another in the back. Detective Demery testified that police found two different calibers of shells fired from two different guns at the scene. He described the weapons as a 9 mm and a .38. Detective Demery testified that Goosby’s weapon had never been recovered, although three shell casings were found in front of the apartment door.
Detective Demery testified that when Goosby turned himself into the police station on the evening of the crime, his hair was visibly shorter than | min the video and he was wearing different clothes. After being read his rights, Goosby denied being at the scene of the shooting and indicated that he was on Fulton Street at the time of the crime.
On cross-examination, Detective Demery testified that he had no information on when Goosby carrie into possession of the gun in the video.
Lisa Stewart was called by the defense to testify. She stated that on the date of the incident she resided in Apartment 145 at King’s Manor Apartments. On that date, R.D. knocked on her door while pointing a gun at her face and asked to speak to “Big,” referring to Goosby. R.D. told her that he was “trying to get something from Big,” who needed to “watch his back” because he was “going to get him.” Stewart stated that Goosby was not present at the time because he had walked to a dollar store. She closed and locked her door and called Goosby.
On cross-examination, Stewart testified that Goosby did not “actually live with” her, but would come there. She did not know where Goosby was located at the time of the shooting because she was in the apartment. After the shooting, she opened the door for Goosby who was “beating” on the door and saw 12-15 people coming toward the apartment. The two left the apartment and went “on Fulton.” She left the Fulton residence without Goosby and returned to her apartment.
Stewart testified that she gave a statement to police. In the statement, she indicated that a third armed individual, *502 named K-9, had an altercation with R.D. after the juvenile pulled a gun on her. The individual claimed that R.D. and his friend had “jumped a couple of people” the day before. In She testified that she also told police that R.D. had pulled a gun on her, but this statement was not recorded. Stewart identified the surveillance video and the individuals it depicted including R.D. and Goosby.
Stewart testified that another video she saw at the police station showed her and K-9. She claimed that she saw three different versions of “this video.” Stewart testified that she did not keep a gun in her apartment because she was afraid of guns. Stewart also testified that Goosby did not cut his hair nor change his clothes that day.
In his testimony, Goosby confirmed that he received a phone call from Stewart alerting him of the situation with R.D. while he was at a dollar store. Goosby recalled that Stewart claimed one of the juveniles pulled a gun on her. He testified that he ran back to the apartments, and had an altercation with R.D. and his friends on the side of the apartment building. Goosby stated that one of the juveniles punched him in the face and, while wrestling, Goosby lifted up the youth’s shirt, saw a handgun, and immediately disarmed him.
Goosby testified that he placed the gun in his pants and ran toward R.D. to ask him what was going on, as the video showed. He claimed that as he walked toward R.D. he kept his hand on the gun in his pants. He did not intend to shoot R.D. Goosby testified that as he approached R.D., R.D. drew a gun on him and Goosby got scared. He was surprised R.D. pulled a gun because he “had slept in my house.” Goosby never thought that R.D. wanted to kill him. Goosby admitted that he also pulled a gun on R.D. and that the two stood face to face with weapons drawn. Goosby testified that at |T2that time, his intent was to scare R.D., not shoot him. Goosby testified that the juveniles went “halfway down Bernstein,” and started firing. He stated that he attempted to get into the apartment, but Stewart had locked the door and would not answer. He heard gunshots coming at him and he returned three shots. He had no knowledge until later that he hit any of the juveniles.
On cross-examination, Goosby denied getting a haircut that day or changing clothes. He stated that he threw the gun “down 70th Street somewhere.” Goosby admitted that he lied to police but stated that he was scared of the consequences he was facing. He denied forcing a confrontation with R.D.
With this evidence, Goosby’s sole argument is that his possession of the gun was justified by self-defense. We conclude from this record that the jury could have reasonably rejected Goosby’s self-defense claim. The video evidence unquestionably shows that while carrying a gun, Goosby pursued R.D. at a time when R.D. and the other juveniles were retreating in a non-hostile manner. From this evidence alone, the jury could have reasonably concluded that regardless of any prior altercation or threats by R.D., at the time of the juvenile’s retreat, Goosby was in no imminent peril of great bodily harm and should have disarmed himself and withdrawn from any further conflict. Moreover, the jury could further determine that it was Goosby who was the aggressor in this situation as he chased the juveniles away from the apartment and then, after a significant allowance of time for retreat, chose to return fire at them at such a great distance away.
| ^Finally, Goosby’s flight from the scene, his initial false report to the police, *503 and his dramatic change of appearance on the day of the incident were evidence from which the jury could have inferred his guilt and rejected his credibility. When viewed in the light most favorable to the state, we find the evidence sufficient to support Goosby’s conviction of possession of a firearm by a convicted felon.
In his second assignment of error, Goos-by argues that the trial court erred in failing to exclude the video from evidence based upon Stewart’s report of a different video. Goosby claims Stewart’s testimony showed alteration of the video and his entitlement to a presumption that the missing portions of the video were detrimental to the state’s case.
On these grounds, Goosby requested that the video be excluded from evidence. The court overruled the objection after rejecting Stewart’s testimony on grounds of credibility. The defense objected to the ruling.
The theory of spoliation of evidence refers to an intentional destruction of evidence for the purpose of depriving the opposing parties of its use. State v. Bobo, 46,225 (La.App.2d Cir.6/8/11), 77 So.3d 1, unit denied, 11-1524 (La.12/16/11), 76 So.3d 1202. Spoliation creates a presumption that the evidence was destroyed because it would have been detrimental to one’s case. Id. The presumption of spoliation is not applicable when failure to produce the evidence is adequately explained. It is generally utilized in civil litigation. In criminal cases, an appellant is not deprived of his due process rights based on the state’s failure to preserve potentially exculpatory evidentiary material unless bad faith is | ^demonstrated. State v. Harris, 01-2730 (La.1/19/05), 892 So.2d 1238, cert. denied, 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005). See also Arizona v. Youngblood, 488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). To receive the adverse inference, two conditions are required, destruction of evidence and bad faith. United States v. Wise, 221 F.3d 140 (5th Cir.2000).
The rejection of Stewart’s testimony by the court was reasonable considering that the fixed nature of the surveillance camera refuted Stewart’s claim that other events near her apartment were in fact contained on the same video. Likewise, the inconsistencies in Stewart’s explanations of the events cast doubt on her overall credibility. Other than Stewart’s testimony, there is no evidence that video material was destroyed. Her testimony is at odds with Detective Johnson’s report of his discovery of the video in his investigation. Ultimately, the jury heard evidence that R.D. threatened Stewart with a gun as well as her belief that the video had been altered. Thus, the jury was able to consider and weigh the evidence. Goos-by’s complaint is without merit.
In his third assignment of error Goosby argues that the trial court erred in failing to grant his motion for new trial on the grounds of the state’s failure to disclose crime lab test results relating to a gun box found in Stewart’s apartment which was evidence favorable to the defense.
On December 6, 2010, Goosby filed a motion to suppress a gun box which was discovered by Detective Johnson upon his sweep of Apartment 145 on the day of the crime. After a hearing in which only Detective]^ Johnson testified, the trial court denied the motion to suppress. This court affirmed that ruling.
Goosby also filed a pretrial motion in limine urging that the court prohibit the state from introducing into evidence or referring to the gun box found in Stewart’s home. The court denied this motion as well after determining that the issue of *504 Goosby’s connection with the gun box was a matter of weight for the jury.
Detective Johnson testified at trial that during his sweep of Apartment 145 he noted an “item.” At this time, the defense objected to Detective Johnson’s testimony and the jury was excused from the courtroom. Defense counsel explained that he would object to any mention of a gun box which was discovered in the search since no proper foundation was laid for the reference. The court agreed and instructed the state to lay a proper foundation as follows:
THE COURT: Well, I’m going to make it clear to you for the third time, and that is that you must connect a box with some weapon used in this offense. And, in fact, in colloquy you’ve told me you have crime lab test results that connect it with this particular gun.
STATE: Correct, Your honor.
THE COURT: Now, I have looked through this discovery because Mr. Gilliam then said you didn’t share those results with him. And what I find in discovery is two requests for any results of any examination or tests.
STATE: I don’t have a report by the crime lab or anybody at the crime lab on this.
THE COURT: Then why did you tell me that you did?
STATE: I said I had information that there was an analysis done. I don’t have a written report. I have nothing in the file.
THE COURT: Let me tell you something. You can’t hide evidence by not putting it in writing, because the Code says they are entitled to 11(ithe results of any examination or test or report. Now, are you trying to play hide the ball, or do you not really have a report?
STATE: I don’t have a report.
After further discussions between the prosecutor and the court, the judge sustained the defense objection. The court specifically refused to allow the state to utilize Detective Johnson’s testimony to establish a foundation for admission of the gun box into evidence. The court also did not allow the state to call a crime lab employee to testify regarding test results on the shell casings found at the scene because no report had been provided to the defense.
Subsequently, the state introduced as evidence the police interviews of Goosby and other witnesses which contained references to the gun box. No objection to the evidence was made by the defense.
After trial, Goosby filed a motion for new trial including a claim that the state failed to disclose the “negative results of crime lab tests” discussed above, in violation of Brady v. Maryland, supra. At the hearing on the motion, the defense called crime lab employee, Carla White, to testify. White testified that she performed firearms analysis on the bullets and gun recovered from the crime scene. In her report, she determined that two of the cartridges found at the scene were fired from the 9 mm Browning pistol found near the juveniles. Three others were fired from another pistol, but were not linked to a particular gun.
White testified that on April 29, 2009, Detective Johnson called her and requested additional analysis of the three unmatched cartridges to 117determine if they had been fired from a 9 mm Ruger pistol, because the state had recovered a Ruger pistol box. She made notes memorializing the conversation in the case record.
Because no gun was recovered from the scene, White was only able to compare database photos of 9 mm Ruger test fired *505 cartridges with those recovered at the scene. On May 4, 2009, White “gave verbal results to Detective Rod Johnson,” indicating that the three fired 9 mm cartridge cases “were consistent” with being fired from a 9 mm Ruger pistol. Ultimately she concluded that “without having a Ruger to compare it to, I cannot say that it was or was not fired from a particular gun.” She explained that the cartridges could have been fired from another weapon. White testified that she never matched the gun box to any shell casings she analyzed.
White explained that she made no written record of this finding which was normal practice if the pistol was not recovered, although she again noted her conversation with Detective Johnson in her case record.
After hearing the testimony and arguments of counsel, the trial court denied the motion for new trial relating to this evidence as follows:
The Court is unable to grant a new trial. The problem is the evidence, I think, viewed in a large sense that was excluded because of the laying of the foundation was actually harmful and not helpful to your client. And so that was excluded. We didn’t let the box in. So I don’t know how your client was prejudiced by your not being able ... to know. But I don’t know how your client was prejudiced on that because the result would have been, as she testified, that it was consistent with a Ruger, although she couldn’t match it to a particular weapon without the weapon. So I think it would have been more to your disadvantage so it’s hard to see how something beneficial was kept from the jury.
1 isThe decision on a motion for a new trial rests within the sound discretion of the trial judge and his ruling will not be disturbed on appeal absent a clear showing of an abuse of discretion. State v. Cox, 10-2072 (La.11/19/10), 48 So.3d 275.
Suppression by the prosecution of evidence favorable to an accused upon his request for such evidence, violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, supra; State v. Barker, 628 So.2d 168 (La. App. 2d Cir.1993), writ denied, 93-3194 (La.3/25/94), 635 So.2d 236. The term “Brady violation” is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence. There are three components of a true Brady claim: (1) The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and, (3) prejudice must have ensued. State v. Garrick, 03-0137 (La.4/14/04), 870 So.2d 990. A discovery violation involving the state’s failure to disclose exculpatory evidence does not require reversal as a matter of the due process clause unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different result. Id.
The trial court’s ruling was correct. White’s testimony that the bullets found at the scene were consistent with a Ruger is not exculpatory evidence. Had that evidence been introduced linking the three shell casings to the type of gun associated with the gun box in Stewart’s apartment, it [19would have indicated that Goosby deliberately armed himself in Stewart’s apartment. Thus, no Brady violation occurred.
Next, Goosby argues that his sentence of 20 years at hard labor is excessive. He claims the trial court improperly *506 rejected the mitigating factors that he acted upon strong provocation of the threat of the juveniles. On December 16, 2011, Goosby filed a motion for reconsideration of sentence, which has not yet been heard or ruled upon.[4]
Prior to sentencing Goosby, the court reviewed the possible mitigating and aggravating circumstances of the case and concluded that no mitigating circumstances existed. The court considered the fact that a gun fight took place at a housing project to be an aggravating factor as an extreme disregard for public safety. The court also considered as aggravating circumstances, Goosby’s use of a dangerous weapon and his history of illegal use of weapons. Finally, the court noted its consideration of Goosby as a dangerous person. Thereafter, the court sentenced Goosby as noted above.
In 2009, La. R.S. art. 14:95.1 provided, in pertinent part:
Whoever is found guilty of violating the provisions of this Section shall be imprisoned at hard labor for not less than ten nor more than fifteen years without the benefit of probation, parole, or suspension of sentence and be fined not less than one thousand dollars nor more than five thousand dollars.
|2nFor his second felony conviction under La. R.S. 15:529.1(A)(l)(a), Goosby faced maximum sentencing exposure of 30 years.
A sentence violates La. Const, art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A trial court has broad discretion in sentencing offenders. Absent a showing of manifest abuse of that discretion, an appellate court may not set aside a sentence as excessive. State v. Kidd, 45,638 (La. App.2d Cir.11/3/10), 55 So.3d 90.
A trial court has wide discretion to sentence within the statutory limits. State v. Black, 28,100 (La.App.2d Cir.2/28/96), 669 So.2d 667, writ denied, 96-0836 (La.9/20/96), 679 So.2d 430. Absent a showing of manifest abuse of discretion, a sentence will not be set aside as excessive. Id.
Considering the serious nature of the present offense which exhibited Goosby’s careless disregard for human life as well as his criminal history which included abuse of weapons, we cannot find the imposed sentence to be constitutionally excessive. Goosby faced 30 years’ sentencing exposure for this crime. Thus, the imposed sentence afforded him leniency in punishment and is not excessive. Moreover, the trial court’s rejection of Goosby’s provocation by the juveniles is supported by the record. Accordingly, this assignment lacks merit.
Im Goosby also assigns as error the lack of advisement of his right to remain silent at his arraignment on the habitual offender charge. He asserts that a review of his multiple proceedings reflect that he was not advised of his right to remain silent, but concedes that he did, in fact, exercise this right and did not testify at these proceedings. Goosby admits that this fact alone provides no adverse effects to his *507 substantial rights requiring reversal. However, he contends that “in cumulation with the multitude of other errors in this case that this error indicates prejudice.”
The failure to inform a defendant of his rights during the habitual offender proceedings is error patent. Nevertheless, under certain circumstances the error may be harmless. State v. Delaney, 42,990 (La.App.2d Cir.2/13/08), 975 So.2d 789; State v. Mason, 37,486 (La.App.2d Cir.12/10/03), 862 So.2d 1077.
La. R.S. 15:529.1(D)(l)(a) requires that the defendant be advised of the specific allegations contained in the habitual offender bill of information and his right to a formal hearing at which the State must prove its case. Implicit in this requirement is the additional requirement that the defendant be advised of his constitutional right to remain silent. State v. Robinson, 46,091 (La.App.2d Cir.4/20/11), 63 So.3d 1113, writs denied, 11-0901 (La.11/23/11), 76 So.3d 1148, 11-1016 (La.11/23/11), 76 So.3d 1149; State v. Delaney, supra.
Generally, the failure of the trial court to advise the defendant of his right to a hearing and his right to remain silent is not considered reversible error where the defendant’s habitual offender status is established by ^competent evidence offered by the State at a hearing rather than by admission of the defendant. However, when the guilt of the defendant is proven by his own stipulation or admission to the habitual offender bill of information, without having been informed of his right to a hearing or his right to remain silent by either the trial court or his attorney, there is reversible error. State v. Robinson, supra; State v. Delaney, supra.
In this case, Goosby received a full hearing prior to his multiple offender adjudication. Therein, the state presented competent evidence to prove his guilt. Considering these facts as well as Goosby’s concession in his brief, no reversible error occurred. This argument has no merit.

Error Patent

Upon our error patent review of the record, two errors patent were noted. At sentencing the trial court did not fully advise Goosby of the time period within which to apply for post conviction relief and failed to impose the sentence without benefit of probation, parole, or suspension of sentence.
By this opinion we now advise Goosby that no application for post conviction relief shall be considered if filed more than two years after the judgments of conviction and sentences have been final. State v. Johnson, 47,024 (La.App.2d Cir.4/11/12), 91 So.3d 1213; State v. Nelson, 46,915 (La.App.2d Cir.2/29/12), 86 So.3d 747.
In addition, the sentence should have been imposed without the benefit of parole, probation, or suspension of sentence. See La. R.S. 14:95.1. However, there is no need to remand for correction of the sentencing error. When a district court fails to order service of sentence ^without benefits in a case in which a determinate time period to be so served is mandated by the statute of conviction, the sentence will automatically be served without benefits for the required time period. La. R.S. 15:301.1(A); State v. Williams, 00-1725 (La.11/28/01), 800 So.2d 790; State v. Braziel 42,668 (La.App.2d Cir.10/24/07), 968 So.2d 853.

Decree

For the foregoing reasons, Goosby’s conviction and sentence are affirmed.
AFFIRMED.

. Goosby was originally charged with one count of attempted first degree murder. At trial, regarding the amended charge, Goosby stipulated that he had been convicted of simple robbery on October 10, 2001, within 10 years of the present offense.

. An independent review of the video specifically shows one of the youths walk back through the mechanical gate heading out of the complex. Another youth, riding a bike, follows him slowly. Then, as a youth wearing a red shirt (identified as R.D.) walks toward the gate, an adult male (identified as Goosby) trails closely behind and attempts to pull something from his shirt. R.D. quickly pulls a gun and points it at Goosby, while moving backwards towards the gate. Goosby points a firearm at R.D., and for a few seconds they both stand in a braced position aimed to shoot each other. R.D. and the other youths turn and run south, while Goosby backs up out of the video’s range.

. In Stewart's recorded statement which was played for the jury, she stated that R.D. pulled the trigger of the gun but the gun misfired.

. In a separate assigned error, Goosby seeks remand of this case for a ruling on his motion to reconsider sentence which has not been addressed by the trial court. This court may review Goosby's sentence for constitutional excessiveness in spite of the pending motion. Upon the trial court's later ruling upon such motion, Goosby may seek appellate review of that decision. State v. Wortham, 47,431 (La. App.2d Cir. 11/14/12), 107 So.3d 132; State v. Jackson, 46,963 (La.App.2d Cir.2/29/12), 87 So.2d 174; State v. Lathan, 41,855 (La.App.2d Cir.2/28/07), 953 So.2d 890, writ denied, 07-0805 (La.3/28/08), 978 So.2d 297.