GARRETT, J.
The defendant, Robert Earl Lynn, was originally charged with second degree murder. The jury convicted him of manslaughter, and he was sentenced, as a second felony offender, to 40 years at hard labor, without benefit of probation or suspension of sentence. He appeals, asserting three assignments of error through counsel and one pro se assignment of error. For the reasons assigned below, we affirm the defendant's conviction and sentence.
FACTS
The defendant's manslaughter conviction arises from an attempted armed robbery that went awry. The shooting victim, William David Carroll, was the roommate of the intended robbery victim, Harry Luzader. Luzader was targeted when he was observed gambling at a local casino and accompanied home by the female codefendant, Shavez Taylor.
The incident began on July 27, 2014, when Taylor entered the Margaritaville Casino in Bossier City at 11:34 p.m. Her boyfriend, Kinoy Singleton, and the defendant followed her into the casino at 11:35 p.m. Their arrival and subsequent actions were recorded on the casino's video surveillance system. At 12:14 a.m. on July 28, 2014, Luzader walked into a men's restroom. Singleton entered the same restroom at 12:15 a.m. and exited at 12:16 a.m. At 12:17 a.m., the defendant entered the same restroom at about the same time that Luzader exited. Subsequently, the defendant, Singleton, and Taylor were seen together behind a pillar. Shortly thereafter, Taylor walked up to Luzader, who was *1265 playing blackjack. After speaking with him, she sat next to him at the blackjack table. A few minutes before 1 a.m., Singleton and the defendant departed the casino. At 1:27 a.m., Luzader and Taylor left the blackjack table. After sitting on a bench outside, they entered a taxi and departed the casino at 2:06 a.m.
Luzader testified that he decided to leave the casino because he was low on money. When he told Taylor he was going home to eat, she said that she was hungry. Luzader invited her to his home to eat. While they were in the taxi, Taylor texted on her cellphone, giving Singleton detailed directions to where they were going.[1] Luzader resided in an upstairs garage apartment, which was located between houses on a secluded, dead-end street in Shreveport. When they arrived at their destination, Luzader had insufficient funds to cover the entire $13 cab fare.
Once in the apartment, Luzader introduced Taylor to his roommate, Carroll, who then retired to his bedroom. He later came back into the living area to tell Luzader that he had seen two guys walking up the driveway. Carroll went downstairs and outside to investigate. He returned and said that the men were at the wrong house. When Luzader asked him if he had locked the door downstairs, he replied affirmatively. Carroll again went to his bedroom while Luzader prepared food in the kitchen. Taylor went downstairs and unlocked the door. She and Luzader were seated with their food when two black males burst into the room. One of the men had a gun and demanded money. Luzader later described him as being about 6'1? and "built like a linebacker," and wearing a white shirt with some kind of print on it. He described the second man as being of medium height and build, with short "spiderweb" dreads that looked like "he had a spider on his head." He wore a dark shirt. According to Luzader, the second man did not have a gun.
Luzader denied having any money and began struggling with the larger robber. He called out to Carroll that the man had a gun. Carroll was still in his bedroom but had begun to open the bedroom door to the living area. The gun discharged, and the bullet penetrated the door, striking *1266 Carroll in the chest. After the gunshot, Taylor and the two intruders fled. Upon seeing Carroll's condition, Luzader ran to a neighbor's home for help, and a call was placed to 911. Emergency services were dispatched at 2:59 a.m. Carroll was pronounced dead at the scene.
Thanks in large part to the casino's security surveillance system, the police were able to develop suspects swiftly. They first identified and interviewed Taylor. After obtaining search warrants for phone records and reading the text messages, they determined that she was a willing participant in the robbery and arrested her.
In her version of events, Taylor denied knowing about the robbery plans but admitted Singleton pointed out Luzader to her at the casino.[2] She claimed that she unlocked the front door "for my benefit," so she would "feel safe," and that she was "shocked" when the men entered. She stated that Singleton entered first, wearing a "white stripy turquoise shirt" and white shorts. She identified the second man as the defendant and described him as wearing a grey shirt with black or grey shorts. She stated that both men were armed and that the defendant placed his gun to her head as she pleaded for her life. After she heard the gunshot, she stated that the defendant fled out the door, and that she grabbed her shoes and ran out of the apartment because she feared that Singleton would shoot her. She said that she and Singleton had had an intimate relationship for a year and that she knew him as "KD," "DaDDY" and "the Magnificent." She said she knew the defendant as "Trigger" and "Lu-Lu."
In September 2014, the defendant was indicted for second degree murder. By amended indictment, Taylor, Singleton, and the defendant were charged with second degree murder for killing Carroll during the attempted perpetration of an armed robbery.
In November 2015, the defendant filed a motion in limine to allow the introduction of "the Singleton affidavit." According to the motion, defense counsel had a sworn affidavit from Singleton, dated June 1, 2015, in which he stated the following:
On the night of 7-27-14 Robert Lynn & I hooked up & went to the boat along with Shavez Taylor. Robert & I played the slots for a while & had something to drink after we were done Robert & I left the boat & went to our original destination which was the club. After being in the club for a little while I told Robert that I was leaving & if he was ready & he told me that he was staying & would ride home with his fam. This was the last time I saw & spoke with Robert.[3]
In August 2016, the defendant filed a motion to sever his trial from those of his codefendants. He asserted that severance was necessary due to the state's intention to use Taylor's inculpatory statement against him and his desire to admit Singleton's exculpatory affidavit in his defense.
At a hearing on August 31, 2016, the trial court ruled that it would sever only Taylor's trial due to her inculpatory statement *1267 against her codefendants. As to Singleton, the trial court ruled that severance was not warranted because Singleton's affidavit was not an admission, and it did not believe it would be admissible even if Singleton's trial was severed from that of the defendant. In its written ruling, which was issued the same day as the hearing, the trial court gave detailed reasons for granting the motion as to Taylor, but, as to Singleton, stated only that "[t]he Court notes that codefendants Robert Earl Lynn and Kinoy Damon Singleton may still be tried together." The trial court also issued a written ruling denying the defendant's motion in limine, finding that the Singleton affidavit was not admissible under La. C.E. art. 804(B)(3) or the jurisprudence.
The defendant and Singleton were tried together in September 2016. The defendant presented testimony from his barber that he had been cutting the defendant's hair since 1995 and that he had never worn it in the style known as spiderweb dreads. Also testifying for the defendant was a former inmate who had been incarcerated with Taylor and knew members of the defendant's family. She testified that Taylor told her that Singleton left the casino to go drop off the defendant at a club. However, Taylor also said that she did not look at the intruders who burst into the apartment and only heard Singleton's voice. Although the defendant filed a notice of alibi defense listing six potential alibi witnesses, none of them testified. While Singleton was convicted as charged of second degree murder, the jury returned a responsive verdict of manslaughter as to the defendant by a vote of 10 to 2.[4]
The state filed a second felony habitual offender bill of information against the defendant. Following a hearing before a different judge in March 2017, the defendant was adjudicated a second felony offender due to a 2008 conviction for distribution of a Schedule II controlled dangerous substance. In June 2017, the trial judge who presided over the defendant's trial sentenced him to a term of 40 years at hard labor without benefit of probation or suspension of sentence.
The defendant appealed. Defense counsel filed three assignments of error, arguing that the trial court erred in denying the defendant's motion to sever his trial from Singleton's, refusing to allow him to present Singleton's affidavit at trial, and allowing the testimony of the state's expert pertaining to cell phone records. The defendant filed a pro se assignment of error alleging that the state knowingly elicited and used false testimony from Taylor.
MOTION TO SEVER/ADMISSIBILITY OF SINGLETON AFFIDAVIT
In two separate assignments of error, the defendant argues that the trial court erred in denying his motion to sever his trial from Singleton's and in not allowing the admission of the Singleton affidavit.
*1268 Because the issues are interconnected, we will consider them together.
Law
Jointly indicted defendants are to be tried jointly unless the court is satisfied that justice requires a severance. La. C. Cr. P. art. 704 ; State v. Webb , 424 So.2d 233 (La. 1982) ; State v. Hodge , 457 So.2d 152 (La. App. 2 Cir. 1984), writ denied , 459 So.2d 545 (La. 1984). The accused is not entitled to a severance as a matter of right, but the decision is one resting in the sound discretion of the trial judge. A denial of a motion to sever will not be overturned on appeal absent a clear abuse of discretion. State v. Webb , supra ; State v. Murphy , 463 So.2d 812 (La. App. 2 Cir. 1985), writ denied , 468 So.2d 570 (La. 1985).
Whether justice requires a severance must be determined by the facts of each case. State v. Turner , 365 So.2d 1352 (La. 1978) ; State v. Hodge , supra . A severance is necessary if the defenses of the codefendants are mutually antagonistic to the extent a codefendant attempts to place the blame on the other, causing each defendant to defend against his codefendant, as well as the state. State v. Turner , supra ; State v. Furgerson , 34,344 (La. App. 2 Cir. 3/2/01), 781 So.2d 1268, writ denied , 01-1102 (La. 3/22/02), 811 So.2d 921. Antagonistic defenses do not represent the only instances where denial of a motion to sever will constitute an abuse of discretion. Where the ends of justice will best be served by a severance, it should be granted. State v. Webb , supra ; State v. Murphy , supra ; State v. Hodge , supra .
The burden is on the defendant to satisfy the trial court that justice requires a severance. Mere allegations are insufficient. State v. Williams , 416 So.2d 914 (La. 1982) ; State v. Furgerson , supra ; State v. Dukes , 609 So.2d 1144 (La. App. 2 Cir. 1992), writs denied , 618 So.2d 402 (La. 1993), 93-1421 (La. 12/15/95), 664 So.2d 435.
Where it is clear from the record that a codefendant would give exculpatory testimony if a severance were granted, the denial of a severance is an abuse of discretion. However, the burden is on the movant to establish that the codefendant would, in fact, testify at a separate trial and the exculpatory nature of his proposed testimony. State v. Turner , supra ; State v. Hodge , supra . But even when a codefendant at a severance hearing had indicated willingness to testify and present exculpatory evidence at a separate trial, a trial judge's denial of a motion to sever on the basis that the codefendant would, in fact, be unlikely to testify because his testimony would be highly self-incriminating, has been held not to be an abuse of discretion. State v. Hodge , supra .
If a codefendant asserts his Fifth Amendment privilege and refuses to testify, he is deemed unavailable and his out-of-court statements are hearsay. State v. Coleman , 14-0402 (La. 2/26/16), 188 So.3d 174, cert. denied , --- U.S. ----, 137 S.Ct. 153, 196 L.Ed.2d 116 (2016). Under La. C.E. art. 804(B), there are certain exceptions to hearsay rules when the declarant is unavailable. La. C.E. art. 804(B)(3) provides:
Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances *1269 clearly indicate the trustworthiness of the statement.
The basis for the exclusion of an accomplice's statement, even one which is against the accomplice's penal interest, is the longstanding perception that custodial confessions of non-testifying, unavailable codefendants are inherently suspect and presumptively unreliable as evidence against the defendant. Moreover, the hearsay exception for declarations against penal interest does not allow admission of non-self-inculpatory statements by accomplices, even if they are made within a broader narrative that is generally self-inculpatory. Accordingly, only the self-inculpatory parts of an accomplice's confession should be admitted. State v. Coleman , supra ; State v. Lucky , 96-1687 (La. 4/13/99), 755 So.2d 845, cert. denied , 529 U.S. 1023, 120 S.Ct. 1429, 146 L.Ed.2d 319 (2000).
Discussion
The defendant contends that the trial court erred in not granting his motion to sever so that he could call Singleton to testify about the portions of the statement that were exculpatory to the defendant.
Based upon our review of the record and the jurisprudence, we find no abuse in the trial court's refusal to sever the defendant's and Singleton's trials or its exclusion of the Singleton affidavit. The defenses of the defendant and Singleton were not antagonistic; both merely claimed to have not participated in the botched armed robbery. Examination of Singleton's affidavit reveals that it was not self-inculpatory. It contained no statement against interest which would allow its admission under La. C.E. art. 804(B)(3). Because it does not inculpate Singleton by placing him at the crime scene, his statement that he last saw the defendant at the club is not exculpatory as to the defendant's whereabouts at the time of the offense.
The record is also devoid of any evidence presented by the defendant to carry his burden of proving that Singleton would testify at a separate trial instead of invoking his Fifth Amendment rights.
The defendant also asserts that the trial court abused its discretion by failing to address his claims in the written ruling on the motion to sever. However, in so arguing, the defendant ignores the fact that the trial court denied the defendant's motion to sever his trial from Singleton's in open court after thoroughly addressing the issue following argument by counsel.[5]
The defendant further contends that the trial court erred in not allowing the jury to weigh the credibility of the Singleton affidavit and that it interfered with his constitutional right to present a defense at his joint trial with Singleton. In support of this argument, the defendant cites State v. Gremillion , 542 So.2d 1074 (La. 1989). In that case, the Louisiana Supreme Court reversed a manslaughter conviction and granted a new trial on the grounds that the trial court impermissibly impaired the defendant's right to present a defense. At issue were two statements by the deceased victim in which he failed to identify the defendant, a close friend, as his attacker. The defendant had punched the victim in the face and then "stomped" him as he lay unconscious. Several hours after regaining consciousness, the victim went to the hospital, where he was diagnosed with traumatic pancreatitis. The victim told the admitting physician that he was attacked by "several others," while recounting to *1270 the police that his attackers were "three white males." The former statement was admitted, but the latter one was disallowed. The Court acknowledged that the statement to the police did not fall into any hearsay exceptions, but ruled that "[w]hile hearsay should generally be excluded, if it is reliable and trustworthy and its exclusion would interfere with the defendant's constitutional right to present a defense, it should be admitted." However, the Court has noted that this "fairness exception" to the hearsay rule is unusual and should be sparingly applied. State v. Trahan , 576 So.2d 1 (La. 1990).
In the instant case, there is nothing to indicate that the Singleton affidavit possessed the same "reliability and trustworthy nature" of the two statements in the Gremillion case, which corroborated each other. See State v. Coleman , supra .
These assignments of error are without merit.
CELL PHONE RECORDS
In this assignment of error, the defendant argues that the trial court erred in allowing the state to present expert testimony about the physical location of his cell phone near the time of Carroll's murder.
Motions and Ruling
In November 2015, the defendant filed a motion in limine seeking to prevent the state from presenting cell phone records, which included information from cell phone towers and the location of the defendant's cell phone in the early hours of July 28, 2014. In August 2016, the defendant filed a motion for a Daubert hearing on the same issue. After jury selection and immediately prior to the commencement of testimony, the trial court held a hearing on both motions. Lt. Shannon Mack of the Bossier Parish Sheriff's Office testified as to her training in the field of cell phone technology. She then stated that she had reviewed the Network Event Location Systems (NELOS) records provided by AT & T pertaining to a cell phone number associated with the defendant. She explained the technology involved and how locations of a cell phone could be determined within an accuracy of 25 to 10,000 meters. She stated that in cases where she had an opportunity to evaluate AT & T's range for accuracy, she had found them to be accurate for the most part and, in some instances, more accurate than the numbers actually applied. After reviewing the jurisprudence, including United States v. Brooks , 715 F.3d 1069 (8th Cir. 2013),[6] the trial court held that the historical records for NELOS were admissible through Lt. Mack's testimony, but admonished against commentary on whether accuracy rates were better than what AT & T said. The defense objected to the trial court's ruling.
During the trial, the NELOS report was admitted without objection during the testimony of Franco Bryant, a records custodian for AT & T. He testified that the report provided information using GPS longitude/latitude mapping to show where a cell phone is located at the time used, as well as a mapping accuracy of the location within a distance of meters. During her trial testimony, Lt. Mack was accepted as *1271 an expert in historical cell phone analysis without objection after detailing her training and experience in the field. Defense counsel stated that he had no objection to Lt. Mack being tendered as an expert in that specific area as long as she testified only as to her interpretation of the phone records furnished by the carrier. An exhibit showing the NELOS information placed on a map was admitted without objection. During direct examination by the state, Lt. Mack stated that the NELOS records placed the cell phone associated with the defendant within 200 meters of the crime scene at 2:21 a.m. Defense counsel made no objections to her testimony. During his cross-examination, he elicited that she was only testifying about her analysis of the AT & T records and that she did not have access to the actual cell phone.
Discussion
In his brief, the defendant claims that his trial counsel "rightfully objected to the testimony and exhibits that the State sought to present through" Lt. Mack. He asserts that Lt. Mack was not a qualified expert to present the cell phone location data and that the trial court "gave no limiting instructions as to the scope or weight of her potentially incorrect testimony." However, our review of the record reveals that no such objections were made at trial to Lt. Mack's qualification, testimony, or the exhibits. Nor was there a request for any limiting instructions. Furthermore, in his brief, the defendant did not assert error in the trial court's ruling on his motions.
When a defendant fails to object to an issue at trial, he is precluded from urging the issue on appeal. La. C. Cr. P. art. 841(A) ; State v. Goldston , 35,271 (La. App. 2 Cir. 12/5/01), 804 So.2d 141. Because the defendant did not contest Lt. Mack's qualifications at trial, he is barred from raising this issue on appeal.
Even assuming arguendo that the issue was before us, the record reveals no error in the trial court's ruling on the defendant's motions. Nor did the trial court abuse its discretion in accepting Lt. Mack as an expert and in admitting the NELOS report into evidence at trial.[7] Trial courts are vested with great discretion in determining the competence of an expert witness, and rulings on the qualification of a witness as an expert will not be disturbed unless there was a clear abuse of that discretion. State v. Farris , 51,094 (La. App. 2 Cir. 12/14/16), 210 So.3d 877, writ denied , 17-0070 (La. 10/9/17), 227 So.3d 828.
This assignment lacks merit.
TAYLOR'S TESTIMONY
In his pro se assignment of error, the defendant generally complains about the state's use of the testimony of codefendant Taylor. He specifically contends that the state "misled the trial court concerning the cooperation agreement it had" with Taylor and that the state knowingly allowed her to perjure herself. He further alleges that he and his attorney were unaware at trial that Taylor had received a 20-year hard labor cooperation agreement for her testimony. The state denies the defendant's claims that Taylor had a plea deal at the time of the defendant's trial. It requests that this court take judicial notice *1272 of the court minutes in Taylor's case which demonstrate that she pled guilty to manslaughter and received a 20-year sentence in November 2016, two months after the defendant's conviction.
At the start of trial, the state and Taylor's attorney informed the court that a plea offer had been made to Taylor, but she had rejected it. When she took the witness stand, Taylor testified that she did not have a plea agreement offer on the table at that time. She admitted that she had been offered a plea of 30 years for manslaughter but stated that she had turned it down. She reiterated the same when cross-examined by the defendant. During closing arguments, the assistant district attorney stated emphatically that no deal had been made with Taylor. At the defendant's June 2017 sentencing hearing, the trial court stated that Taylor had testified "without a firm deal in place," but she ultimately had been given consideration for her testimony by the state and received a hard labor sentence of 20 years as a consequence of her testimony.
La. C. Cr. P. art. 717(B) requires the district attorney to disclose "any inducement offered by the district attorney, or by any law enforcement officer on behalf of the district attorney, to any state witness." Nothing in this record demonstrates that the state failed to comply with that requirement. To the contrary, both the state and Taylor candidly admitted at trial that a plea had been offered and rejected. The bare fact that Taylor subsequently pled guilty to manslaughter and was sentenced to 20 years is not evidence that a plea agreement existed at trial and induced her to testify against the defendant.
As to the defendant's attacks on Taylor's testimony, they do not rise to the level of a claim of insufficiency of evidence. However, even assuming arguendo that they did, as an appellate court, we do not assess the credibility of witnesses or reweigh evidence. State v. Smith , 94-3116 (La. 10/16/95), 661 So.2d 442 ; State v. Mitchell , 50,188 (La. App. 2 Cir. 11/18/15), 181 So.3d 800, writ denied , 15-2356 (La. 1/9/17), 214 So.3d 863. Furthermore, viewed in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 01-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004).
This assignment of error is meritless.
ERRORS PATENT
Failure to advise of rights at habitual offender proceeding
Our error patent review indicates that the defendant was not advised of his rights during his habitual offender proceedings. The failure to inform a defendant of his rights during the habitual offender proceedings is error patent. Nevertheless, under certain circumstances, the error may be harmless. State v. Goosby , 47,772 (La. App. 2 Cir. 3/6/13), 111 So.3d 494, writ denied , 13-0760 (La. 11/1/13), 125 So.3d 418 ; State v. Delaney , 42,990 (La. App. 2 Cir. 2/13/08), 975 So.2d 789 ; State v. Mason , 37,486 (La. App. 2 Cir. 12/10/03), 862 So.2d 1077.
La. R.S. 15:529.1(D)(1)(a) requires that the defendant be advised of the specific allegations contained in the habitual offender bill of information and his right to a formal hearing at which the state must prove its case. Implicit in this requirement is the additional requirement that the defendant be advised of his constitutional right to remain silent.
*1273 State v. Robinson , 46,091 (La. App. 2 Cir. 4/20/11), 63 So.3d 1113, writs denied , 11-0901, 111016 (La. 11/23/11), 76 So.3d 1148, 1149; State v. Delaney , supra .
Generally, the failure of the trial court to advise the defendant of his right to a hearing and his right to remain silent is not considered reversible error where the defendant's habitual offender status is established by competent evidence offered by the state at a hearing rather than by admission of the defendant. However, when the guilt of the defendant is proven by his own stipulation or admission to the habitual offender bill of information, without having been informed of his right to a hearing or his right to remain silent by either the trial court or his attorney, there is reversible error. State v. Goosby , supra ; State v. Robinson , supra ; State v. Delaney , supra .
In this case, the defendant received a full hearing prior to his habitual offender adjudication. Therein, the state presented competent evidence to prove his guilt. Considering these facts, no reversible error occurred.
Error in minute entry regarding benefits
An error patent review reveals a discrepancy between the transcript and the minute entry for the sentencing hearing. The sentencing transcript shows that the trial court sentenced the defendant as a second-felony offender to 40 years at hard labor without the benefit of probation or suspension of sentence, pursuant to La. R.S. 15:529.1(G). However, the minutes reflect that the sentence is also to be served without benefit of parole.
La. C. Cr. P. art. 871(A) provides that a "[s]entence shall be pronounced orally in open court and recorded in the minutes of the court." When there is a discrepancy between the minutes and the transcript, the transcript prevails. State v. Lynch , supra ; State v. Bell , supra .
Accordingly, we order that the June 1, 2017 minute entry be amended to reflect that the defendant's sentence is to be served without benefit of probation or suspension of sentence.
CONCLUSION
The defendant's conviction and sentence are affirmed.
AFFIRMED.

Taylor continued texting Singleton even after her arrival at Luzader's residence. Although Taylor asserted that she gave Singleton that information as a safety measure so someone would know where she was if misadventure befell her, the actual texts thoroughly refute this claim and reveal their true intentions. From the record, we have compiled the following excerpt of their exchange, complete with typographical imperfections:
Taylor: "Make a left on holly st the"
Taylor: "look for the house for rent sign and its the second house once u go in the driveway towards the back"
Taylor: "u will see 2 blue porch poles and steps"
Singleton: "K."
Taylor: "dont go pass the white van uve went too far"
Singleton: "K."
Taylor: "K."
Singleton: "U with him"
Taylor: "yes"
Singleton: "Ok can u leave the door unlocked know where the $ is we here."
Singleton: "He gnt a gun"
Taylor: "that I dont know i didnt know it was another one but they tink ur looking for the wrong house."
Singleton: "Ok we need to know when to come without bein seen asap"
Taylor: "the door should be unlocked and i dont know where the money is"
Singleton: "Where the other dude"
Taylor: "be carwfull the door has steps as soon as u come thru the door"
Taylor: "in theroom with the door closed"
Singleton: "Who is in the wind6w"
Taylor: "No one"
Singleton: "K"
Taylor: "i unlocked the front door where are u"
Singleton: "We comin"
Taylor: "K"

Our recitation of Taylor's version is compiled from her trial testimony and the testimony of the lead detective who questioned her.

The affidavit is not included in the appellate record. However, it was quoted in its entirety in the defendant's motion in limine in the trial court, and a copy of the handwritten affidavit was attached to the defendant's motion to supplement the record in this court. We denied the defendant's motion to supplement it into the record, concluding that the trial court was in a better position to decide whether the record should be supplemented.

The minute entry for September 21, 2016, incorrectly states that "[t]he court ordered the jury polled upon, and twelve (12) jurors answered 'yes' that this was their verdict." The transcript states that the jurors were polled in writing and, after the slips were counted, the court announced, "We have a unanimous verdict as to Mr. Singleton and ten/two as to Mr. Lynn."
We note that the same minute entry also states, "Evidence of the defense was adduced and closed. The defendant adduced no evidence and all evidence concluded." The transcript shows that the defendant presented three defense witnesses.
Accordingly, the trial court is instructed to correct these errors in the minutes, as the transcript controls over the minutes when there is a conflict. State v. Lynch , 441 So.2d 732 (La. 1983) ; State v. Bell , 51,312 (La. App. 2 Cir. 5/17/17), 222 So.3d 79.

Although the trial court had already drafted its written ruling, it invited counsel to argue the matter due to the filing of a supplemental brief. However, the trial court was unpersuaded by the additional arguments.

In Brooks , supra , the appellate court affirmed the trial court taking judicial notice of the accuracy and reliability of GPS technology. It observed that "[c]ommercial GPS units are widely available, and most modern cell phones have GPS tracking capabilities. Courts routinely rely on GPS technology to supervise individuals on probation or supervised release, and, in assessing the Fourth Amendment constraints associated with GPS tracking, courts generally have assumed the technology's accuracy." The court also affirmed the trial court's action in allowing the GPS evidence to be admitted through the testimony of a lay witness.

The recent case of Carpenter v. United States , --- U.S. ----, 138 S.Ct. 2206, 201 L.Ed.2d 507 (2018), which held that the government must generally obtain a search warrant supported by probable cause before acquiring cell-site location information from a wireless carrier, was mentioned at oral argument. However, we note that the record indicates that the cell phone information in the instant case was obtained pursuant to search warrants.