McCALLUM, J.
Kinoy Singleton, who was convicted of second degree murder and sentenced to life imprisonment, appeals his conviction. We affirm his conviction and sentence.
FACTS
At 2:05 a.m. on July 28, 2014, Harry Luzader left Margaritaville Casino in Bossier City, Louisiana, after many hours of drinking and playing blackjack there. Luzader was accompanied by Shavez Taylor ("Taylor"), whom he had met a couple of hours earlier when she approached him at a blackjack table. Luzader and Taylor took a cab to an upstairs garage apartment ("apartment") that Luzader shared with William David Carroll. The apartment was located behind the residence at 3134 Holly Street, a dead-end street in Shreveport, Louisiana. The front door of the apartment was located on the first floor, and there was an interior stairway leading to the apartment.
Taylor was on her phone during the cab ride, but Luzader did not know if she was texting or playing games on it. Luzader lacked sufficient cash to pay the entire $13 fare to the driver, Demetric Jackson, so he went to the apartment to get the necessary amount. Meanwhile, Taylor remained in the cab and continued to play on her cell phone. Jackson, thinking the situation was strange, asked Taylor to wait outside the cab. Jackson left without receiving the full fare when Luzader returned without the remainder.
Upon entering the apartment, Luzader introduced Taylor to Carroll and began preparing food for Taylor. After they had been in the apartment for approximately 10-15 minutes, Carroll exited his bedroom and told Luzader that two men were walking up the driveway. Carroll went downstairs to the apartment's front door. When Carroll came back upstairs, he said that the men had the wrong house. Luzader asked Carroll if he had locked the door, and Carroll said yes. Taylor, who was in the den, continued using her phone while this was happening. Unbeknownst to Luzader, Taylor was communicating with the two men outside. After Luzader returned to the kitchen to finish preparing the food, Taylor, who was alone in the den, unlocked the apartment's front door.
After Luzader came back to the den with the food and sat down on a couch, a man holding a gun burst through a curtain *1273 that was used to cover the stairway and demanded money. Luzader believed a second man who had entered the apartment was near the curtain, but Luzader was more focused on the man who was pointing a gun at him. As Carroll began opening his bedroom door, Luzader heard a gunshot. Carroll sustained a gunshot wound to the chest after being shot through the bedroom door. Taylor and the two males then fled the apartment. Luzader estimated that the incident lasted 30 to 40 seconds.
Freddie Stokes, who lived in a home near the apartment, awoke to Luzader pounding on his front door and screaming that "somebody tried to rob us" and "somebody shot my buddy." While Stokes' wife called 911, Stokes ran to the apartment with Luzader. Stokes discovered Carroll face down on the floor and making a gurgling sound.
Captain Barry Seidel with the Shreveport Fire Department was dispatched to the apartment at 2:59 a.m. Seidel declared Carroll dead.
Corporal James Tilley with the Shreveport Police Department described the area around the apartment as secluded and very dark. He thought the apartment was difficult to find and that someone driving down Holly Street would not know there was an apartment in the back. Luzader, who was highly intoxicated,[1] did not give an in-depth description of the two males to Tilley other than to say one was bigger than the other. Luzader told Tilley that he fought for his life and had been pistol-whipped, but Tilley did not see signs of a struggle in the apartment or signs of an altercation on the shirtless Luzader. Luzader was secured in a patrol car, then transported to the homicide unit's office.
Detective Joe Brown with the homicide unit of the Shreveport Police Department was the lead detective on the case. Brown, who interviewed Luzader at his office, was assisted in the investigation by Detectives Mayfield and Moss. Luzader was considered a possible suspect at the time of his interview.
Luzader described the gunman as a large black male who was 40 years old and looked like a linebacker. He estimated the man's height to be 6'2? and his weight to be 220 pounds. Luzader stated that the man was wearing shorts and a white shirt with a plaid animal print on it. Luzader described the other man who entered the apartment as a short black male with dreads that looked like a spiderweb on top of his head. He testified that this man was wearing a dark shirt. Luzader explained at trial that by spiderweb dreads he meant short dreads. He told detectives that the second male did not have a gun. Luzader was unable to remember Taylor's name during the interview with detectives.
As Luzader was interviewed, the information he provided was being relayed to the surveillance department at Margaritaville. Sonja Taylor ("Sonja") worked as the surveillance lead at Margaritaville. When she came to work on the morning of July 28, she was asked to determine if Luzader had been at the casino on that date, what time he entered the property, and if she could identify the female who accompanied him as he left the property. Checking the casino's database to determine if Luzader had used his player's card, she learned that Luzader had entered the casino on the afternoon of July 27 and had gambled by himself until just after midnight. She was later asked if the female had arrived with anyone or associated with *1274 anyone before Luzader. She was also given a description of a black female with two black males, one of whom was wearing a white shirt with a turquoise print on the front, while the other male was wearing a dark or gray shirt. She was not told that one of the males had a dreadlock hairstyle.
Sonja saw that the female had entered the casino's gaming area at 11:34 p.m. followed by two men whose appearances Sonja felt were consistent with the police descriptions given to her by her supervisor. One male was wearing a white shirt with an argyle print on the front. The other male was wearing dark colored shorts and a gray shirt. When these three individuals entered the gaming area, their IDs were scanned and photographed as per casino policy. The female's name was Shavez Taylor, and the males' names were Robert Lynn and Kinoy Singleton. Margaritaville faxed copies of their IDs to the detectives. Sonja determined that the three had entered the casino at 11:30 p.m. after parking their vehicle in the lot for the nearby Bass Pro Shop. Taylor left the casino's gaming area at 12:14 a.m. with Singleton and Lynn not far behind her.
A hallway separated the entrances to the men's and women's restrooms just outside the gaming area. The surveillance video showed that Luzader, who had been playing blackjack, headed toward the restroom at 12:14 a.m. before entering it a minute later. Taylor entered her restroom at about the same time. Meanwhile, Singleton and Lynn stood near a bar before Singleton entered the men's restroom. Singleton exited the restroom at 12:16 a.m. Lynn then entered the men's restroom at 12:17 a.m. Luzader and Taylor walked out of their respective restrooms at 12:17 a.m., with Lynn behind them. Taylor, Lynn, and Singleton then gathered behind a column near the bar. Luzader returned to the casino area at 12:18 a.m. He was joined at the blackjack table by Taylor at 12:19 a.m. Lynn and Singleton remained near the bar for a couple of minutes before entering the gaming area and heading toward the slot machines.
At 12:47 a.m., Taylor joined Lynn and Singleton in the slot machine area. She left them a minute later. She rejoined them in the same area at 12:52 a.m. All three began leaving the slots area at 12:53 a.m., although Taylor stopped along the way at a slot machine while Lynn and Singleton continued walking. At 12:54 a.m., Lynn and Singleton exited the casino. At 12:58 a.m., their vehicle left the parking lot.
At 12:54 a.m., Taylor returned to the blackjack table where Luzader continued to gamble. Luzader and Taylor left the table together at 1:27 a.m. They waited outside the casino entrance for some time before leaving in a cab at 2:05 a.m.
Sonja testified that she saw no individuals associate with Taylor other than Lynn and Singleton. Sonja also testified that Taylor, Lynn, and Singleton were the only individuals that she saw who fit the descriptions given to her.
Based upon the information obtained from the casino, homicide detectives located Taylor and brought her in for an interview. Detective Brown did not have immediate access to the video, but viewed it before interviewing Taylor on the afternoon of July 29. After Taylor identified Singleton and Lynn in separate photo lineups, arrest warrants were obtained for the pair. The residence where Singleton had lived with his wife was searched, and his vehicle was impounded and searched as well.
Taylor had a phone in her possession during the interview. The number for that phone was 553-7956.[2] Detectives examined the phone and its contact information. It was determined that the phone number of *1275 207-4025 belonged to Lynn, whose nickname was "Trigger" or "Trig." Taylor identified three numbers in her phone as being used by Singleton. Those numbers were listed under the contact names of "DADDY," "DaDDY," and "Lover's Shop." One of the numbers listed under the contacts for Singleton was 422-2093. "Lover's Shop" was the main number at the barbershop where Singleton worked.
Based upon what he learned from the contact information as well as what Taylor told him, Brown believed that in the hours leading up to the murder, Taylor used the 422-2093 phone while Singleton used a phone with the number 455-5395.
Taylor was arrested once the police were able to view the text messages for 455-5395 and could see that she was a willing participant in the robbery. The text messages exchanged between the numbers used by Singleton and Taylor late in the evening on July 27 and early in the morning of July 28 are listed below along with the time sent. All of Singleton's texts end with "the Magnificent" as the signature.
*1276 11:45 Taylor to Singleton baby im playing the machine and hittinh 11:50 Singleton to Taylor K 11:50 Singleton to Taylor I got a white cougar 11:52 Taylor to Singleton Ok 12:04 Singleton to Taylor Dont lose it bacc 12:10 Taylor to Singleton Ok 12:11 Taylor to Singleton Daddy its dead in here 12:13 Singleton to Taylor Meet at the front 12:14 Taylor to Singleton Ok 12:40 Singleton to Taylor Wuz good my Queen 12:41 Taylor to Singleton Lookin at him win 12:43 Singleton to Taylor Caught his attention 12:46 Singleton to Taylor What he playin 12:47 Taylor to Singleton 21 01:29 Taylor to Singleton he just invited me to go to his house where are u 01:30 Singleton to Taylor Not far the Warehouse 01:35 Singleton to Taylor Ask where he stay 01:35 Taylor to Singleton We outsidd 01:37 Singleton to Taylor Ok hold him up 01:38 Taylor to Singleton Ok 01:41 Taylor to Singleton Sport the cab is here 01:43 Singleton to Taylor Teyt me wwhere yal goin we alm there 01:43 Taylor to Singleton sport 01:44 Taylor to Singleton Ok 01:46 Singleton to Taylor Where r yall now 01:50 Taylor to Singleton Still here 01:52 Singleton to Taylor We here 01:53 Taylor to Singleton K 01:56 Singleton to Taylor when yall leavin 01:57 Singleton to Taylor C me 01:57 Taylor to Singleton 10 min 01:58 Singleton to Taylor Im behind u 02:01 Taylor to Singleton Ok 02:02 Singleton to Taylor Wtf 02:05 Singleton to Taylor Wuz the deal 02:05 Taylor to Singleton We inthe cab 02:06 Singleton to Taylor At elderado 02:06 Taylor to Singleton His house we leavin now 02:07 Taylor to Singleton Where are u 02:08 Taylor to Singleton Kings hwy loction 02:08 Taylor to Singleton Where the f*** are u 02:10 Singleton to Taylor headin to kings 02:11 Singleton to Taylor On Kings 02:11 Taylor to Singleton Damn what took so f***in long 02:12 Taylor to Singleton We too 02:12 Singleton to Taylor Where *1277 02:13 Singleton to Taylor We by mcdonalds 02:14 Taylor to Singleton Make a left on holly st the 02:16 Taylor to Singleton look for the house for rent sign and its the second house once u go in the drive way towards the back 02:16 Taylor to Singleton u will see 2 blue porch poles and steps 02:16 Singleton to Taylor K 02:17 Taylor to Singleton dont go pass the white van uve went too far 02:18 Singleton to Taylor K 02:18 Taylor to Singleton K 02:20 Singleton to Taylor U with him 02:21 Taylor to Singleton yes 02:23 Singleton to Taylor Ok can u leave the door unlocked know where the $ is we here 02:30 Singleton to Taylor He gnt a gun 02:31 Taylor to Singleton that i don't know i didnt know it was another one but they tink ur looking for the wrong house 02:34 Singleton to Taylor Ok we need to know when to come without bein seen asap 02:34 Taylor to Singleton the door should be unlocked and i dont know where the money is 02:35 Singleton to Taylor Where the other dude 02:35 Taylor to Singleton be carwfull the door has steps as soon as u come thru the door 02:36 Taylor to Singleton in theroom with the door closed 02:37 Singleton to Taylor Who is in the wind6w 02:39 Taylor to Singleton No one 02:45 Singleton to Taylor K 02:46 Taylor to Singleton i unlocked the front door where are u 02:47 Singleton to Taylor We comin 02:47 Taylor to Singleton K
Indictments
On September 17, 2014, Singleton was indicted for the July 28, 2014, second degree murder of William David Carroll. By amended indictment, Singleton and his codefendants, Shavez Taylor and Robert Lynn, were charged with second degree murder for killing Carroll during the attempted perpetration of an armed robbery.
The case was set for trial on September 12, 2016. On August 31, 2016, the trial court severed Taylor's case due to the state's plan to introduce statements by Taylor inculpating Singleton and Lynn. On September 12, 2016, prior to the commencement of trial, Singleton filed a motion for continuance. The trial court denied the continuance and Singleton and Lynn were tried together.
Trial
Luzader provided testimony regarding the events leading up to Carroll's murder. The jury also heard testimony from Luzader's neighbor and from the cab driver who transported Luzader and Taylor from the casino to the apartment. Some of the fire and police personnel who responded to the 911 call from the neighbor's wife testified as well.[3]
*1278 Sgt. Eric Farquhar with the Crimes Scene Unit for the Shreveport Police Department testified about processing the crime scene. He found a nonworking .22 revolver in Carroll's bedroom, a single bullet hole in the bedroom door, and a single 9mm shell casing in the den. A 9mm projectile was later recovered from Carroll's body. Farquhar did not collect any fingerprints or DNA samples at the apartment.
Farquhar was contacted the next day about a search warrant being executed at the home ("home") of Singleton's wife. A Smith & Wesson handgun box containing both a 9mm magazine and a box of Winchester 9mm bullets was found in the closet of the master bedroom. Another box of Winchester 9mm bullets was found in the drawer of a nightstand in the master bedroom. Farquhar described the cartridge found in the apartment as a Winchester 9mm casing, but he did not know the brand of the projectile. Farquhar testified that .38 ammunition was also found in the home.
Singleton's silver Cadillac car was impounded and searched, but nothing of evidentiary value was found in it.
Sonja Taylor from Margaritaville Casino explained to the jury how, based upon information provided to her by detectives, she was able to determine the locations of Luzader, Taylor, Lynn, and Singleton at the casino during various times on July 27-28.
Karen Milbrook testified as a custodian of records for Verizon in order to authenticate the text messages for 455-5395 and 553-7956 that were introduced into evidence.
Franco Bryant testified as a custodian of records for AT & T. A NELOS report was prepared for Lynn's phone number, 207-4045, covering July 23 to July 30. Bryant explained that a NELOS report uses GPS mapping to determine the location of a handset while it is being used.
Lieutenant Shannon Mack of the Bossier Parish Sheriff's Office testified as an expert in historical cellphone analysis. Mack utilized a software program that mapped the data from the NELOS report. She determined that: (i) at 10:36 p.m. on July 27, Lynn's phone was in the area of Margaritaville within a 300 meter accuracy; (ii) at 1:14 a.m. on July 28, the phone appeared to be in downtown Shreveport; (iii) at 2:21 a.m. on July 28, the phone was at 3134 Holly Street in Shreveport within a 200 meter accuracy.
Shavez Taylor ("Taylor") testified that she asked Lynn and Singleton to take her to the casino on the night of July 27. Taylor, who first met Singleton in October of 2013 at the barbershop where he worked, had been in an intimate relationship with Singleton that had lasted until March of 2014. She testified that she used the nickname "KD" for Singleton, but mostly called him "Daddy." Taylor claimed that she had consumed alcohol and had used marijuana and ecstasy before going to the casino that night.
Taylor claimed that Singleton pointed out Luzader to her at the casino and asked her to approach him. While Taylor admitted that she led Singleton and Lynn to the apartment, she said she did not intend any harm in doing this. She claimed that she did not feel threatened by Carroll or Luzader, but yet felt it was necessary for Singleton to know where she was in case something happened to her. Taylor also asserted that she unlocked the apartment door for her benefit. Although she knew Lynn and Singleton were nearby, she did not think they were going to enter the apartment and cause harm. Taylor, who was awaiting trial, told the jury that she turned down a plea offer of manslaughter with a sentence of 30 years.
Taylor asserted that she saw Singleton and then Lynn in the apartment. She described *1279 Singleton as wearing a "white stripy turquoise shirt" with white shorts. Lynn was wearing a gray shirt with black or gray shorts or pants. Taylor claimed that both men had guns, and that Lynn put a gun to the back of her head as she was on her hands and knees. Taylor testified that she saw Singleton struggle with Luzader. She said she heard a gunshot when Carroll cracked open the bedroom door.
Regarding the cellphone numbers, Taylor explained that 553-7956 was the number for her pay-as-you-go phone from Straight Talk. That was her permanent phone and was the phone in evidence. She also stated that 455-5395 was the number for her government-provided substitute cellphone, while the number 422-2093 belonged to a phone that she had borrowed from a third party.
Detective Brown testified that based on his investigation, 455-5395 was the number associated with Singleton during the homicide. He added that even though 422-2093 was listed as Singleton's number in Taylor's phone, that was the number that Taylor said she was using on the night of the murder. Brown was unsure who was using the 422-2093 number on the early morning of July 27. He concluded that while Taylor had used different phones, she went back to her permanent phone after the murder.
Brown testified that he determined who used the numbers based on what Taylor had told him, and what she said was corroborated by looking at her phone. Brown added that Taylor had attached photos to the contacts on her phone. Brown insisted that it was not a fair statement that his entire investigation hinged on what Taylor had told him. While part of his conclusion on who was using what phone numbers at what time came from Taylor, the other part came from using common sense when reading the text messages.
Brown testified that Taylor told him that Singleton referred to her as "Queen." Brown acknowledged that this was not in his report. Brown also stated that Taylor told him that Singleton called himself "the Magnificent," and that she referred to him by that nickname once during the interview. However, nowhere in his report was Singleton referred to as "the Magnificent."
Brown agreed that Taylor was not honest. He thought she told the truth during the interview until they reached her specific involvement in the crime, and then she began lying to cover up her involvement. He also noted that she lied about deleting text messages before giving her phone to them. However, he did not think that she was lying about the individual with whom she was exchanging text messages on the night of the murder.
Brown did not recall Taylor saying during the interview that Singleton had pointed out Luzader to her. Viewing the surveillance video, Brown said he did not see Singleton point at anyone or engage in conversation with Luzader.
After the State rested, Singleton called his wife, Kimberly Singleton, and Sgt. Farquhar as witnesses. Mrs. Singleton testified that she and her husband were separated at the time the home was searched. She further testified that her husband had used 347-3487 and 990-1535 as his cell phone numbers. He also had a phone number at the barbershop where he worked. In regards to the empty gun box found at her residence, Mrs. Singleton testified that she told detectives that the gun had been reported stolen from her home in October of 2013.
Lynn called Marion Marks, Kendrick Davis, and Tamika O'Neal as witnesses. Marks provided enhanced still images taken from the surveillance videos. Davis, who was Lynn's barber for 21 years, explained that Lynn's hair style is a skin fade, which *1280 is bald on the side with a little bit of hair on top. He further explained that Lynn had never grown his hair out, and that Lynn had never worn his hair in spiderweb dreads.
O'Neal was incarcerated with Taylor at Caddo Correctional Center for four months beginning in August of 2014, and for four months beginning in November of 2015. O'Neal asserted that Taylor told her that: (i) she was texting Singleton while in the cab to let him know where she was going; (ii) during the robbery, she recognized Singleton's voice but never looked up from her position to see who was there; and (iii) Singleton's mother was trying to convince her of Lynn's involvement in the crime.
Verdict
The jury unanimously found Singleton guilty as charged of second degree murder, and found Lynn guilty of the responsive verdict of manslaughter by a vote of 10-2. Lynn previously appealed, and this Court affirmed his conviction and sentence. State v. Lynn , 52,125 (La. App. 2 Cir. 8/15/18), 251 So.3d 1262.
Singleton filed a motion for new trial, arguing error in the denial of the motion to continue and insufficient evidence. The trial court denied the motion at a hearing on February 23, 2017. After Singleton waived sentencing delays, the trial court sentenced him to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. This appeal followed.
DISCUSSION
Sufficiency of the evidence
Singleton argues on appeal that the State failed to carry its burden of proof in this case, and that the testimony of Taylor, who was repeatedly impeached, was insufficient to convict him of second degree murder. Singleton claims that: (i) Luzader could not identify the two men who entered his apartment; (ii) evidence that Lynn's phone was at the crime scene does not prove that Singleton was there; (iii) other than Taylor's suspect testimony, there is no evidence that Singleton was in possession of the phone that Taylor was texting; (iv) Taylor's testimony is internally inconsistent as well as inconsistent with the testimony of other witnesses; (v) there was no effort to obtain fingerprints or DNA from the crime scene; and (vi) evidence of a gun box and ammunition found in a home where Singleton was not currently residing is not proof of anything.
In reply, the State contends that the evidence presented at trial was sufficient to support Singleton's conviction. The State notes that Taylor identified Singleton as an accomplice and as the person who fired the shot that killed the victim, and that her testimony was corroborated by the videotape from the casino, cellphone tracking evidence, cellphone texting evidence, and the clothing of all the perpetrators as shown in the video and as similarly described by Luzader. Noting that Taylor was thoroughly examined by two defense attorneys and that the discrepancies in her testimony were considered by the jury, the state argues that the defense is improperly seeking to have this Court assess the credibility of Taylor's testimony and reweigh the evidence.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proved beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ; State v. Tate , 2001-1658 (La. 5/20/03), 851 So.2d 921, cert. denied , 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004) ; State v. Carter , 42,894 (La. App. 2 Cir. 1/9/08), 974 So.2d 181, writ *1281 denied , 2008-0499 (La. 11/14/08), 996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford , 2005-0477 (La. 2/22/06), 922 So.2d 517 ; State v. Dotie , 43,819 (La. App. 2 Cir. 1/14/09), 1 So.3d 833, writ denied , 2009-0310 (La. 11/6/09), 21 So.3d 297.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Sutton , 436 So.2d 471 (La. 1983) ; State v. Robinson , 50,643 (La. App. 2 Cir. 6/22/16), 197 So.3d 717, writ denied , 2016-1479 (La. 5/19/17), 221 So.3d 78.
The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith , 1994-3116 (La. 10/16/95), 661 So.2d 442. A reviewing court accords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. State v. Casaday , 49,679 (La. App. 2 Cir. 2/27/15), 162 So.3d 578, writ denied , 2015-0607 (La. 2/5/16), 186 So.3d 1162.
Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Crossley , 48,149 (La. App. 2 Cir. 6/26/13), 117 So.3d 585, writ denied , 2013-1798 (La. 2/14/14), 132 So.3d 410 ; State v. Speed , 43,786 (La. App. 2 Cir. 1/14/09), 2 So.3d 582, writ denied , 2009-0372 (La. 11/6/09), 21 So.3d 299. In the absence of internal contradiction or irreconcilable conflict with physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient support for a requisite factual conclusion. State v. Johnson , 47,913 (La. App. 2 Cir. 4/10/13), 113 So.3d 1209.
La. R.S. 14:30.1(A)(2) defines second degree murder as the killing of a human being:
When the offender is engaged in the perpetration or attempted perpetration of ... armed robbery, first degree robbery, second degree robbery, [or] simple robbery ... even though he has no intent to kill or to inflict great bodily harm.
Singleton argues that Luzader was unable to identify the two men who entered his apartment. He claims that the description of the shirt worn by him that night does not match the description provided by Luzader. At trial, Luzader testified that the first man, asserted by the State to be Singleton, was about 6'2? and built like a linebacker, and was wearing a white shirt with some kind of print. Luzader described the print on the shirt as a plaid or diagram pattern, and as a lion or animal print in gray or black. However, he contends the surveillance department at Margaritaville was given the description of a black man wearing a white shirt with a turquoise print on the front. Sonja Taylor located Singleton on the surveillance video and he was wearing a white shirt with a turquoise diamond or argyle print. Further, Shavez Taylor ("Taylor") testified that Singleton was wearing a white, stripy, turquoise shirt.
Singleton further notes a discrepancy as to the description of Lynn's hair. At trial, Luzader testified that the second man, asserted *1282 by the state to be Lynn, had short spiderweb dreads that looked like "he had a spider on his head." However, Sonja Taylor and Detective Joe Brown testified that Lynn's hair was short in his driver's license photograph and in the photograph used for the lineup. Furthermore, Lynn's barber for over 20 years testified that Lynn's hair has always been cut in a skin fade, and that Lynn has never had dreads.
Evidence at trial established that the number 207-4045 was associated with Lynn and was found in Taylor's phone listed under her contact for "Trig." Lieutenant Shannon Mack, an expert in historical cellphone analysis, analyzed the NELOS report and placed Lynn's phone at Margaritaville Casino at 11:38 p.m. on July 27, and at the location of the crime at 2:21 a.m. on July 28. Singleton argues that even if that proved Lynn was at the crime scene, it did not prove that Singleton was there.
Singleton next argues that there was no subscriber information for the numbers 422-2093 and 455-5395, and there was no evidence outside of Taylor's testimony that he ever had the 455-5395 phone. The texts from 455-5395 contained the signature, "the Magnificent," which Taylor told the police belonged to Singleton. Thus, he maintains that there was no reliable evidence that the phone that he was supposedly using was at the casino at the same time as he was or at the crime scene.
Singleton claims that Taylor's testimony was internally inconsistent as well as inconsistent with the testimony of other witnesses. Taylor testified that Luzader paid for the cab, but Luzader and the cab driver stated that Luzader did not have enough money to pay the entire fare. Luzader testified that the second man, Lynn, did not have a gun and acted as a lookout. Taylor testified that each man had a gun, and that Lynn put a gun to the back of her head while she was on her hands and knees. Taylor asserted that she saw both men enter the apartment and was able to identify them. However, Tamika O'Neal claimed that Taylor told her that she could identify Singleton by his voice, but she never looked up to see who was there. Taylor was also inconsistent regarding whether Lynn or Singleton entered the apartment first. Taylor claimed that Singleton physically pointed out Luzader to her at the casino, but this was not shown on the surveillance video. Finally, Taylor testified that she did not delete any texts from her phone, but Detective Brown testified that she had lied to him about altering her phone.
Singleton notes that Sergeant Farquhar did not attempt to obtain fingerprints or DNA evidence from the crime scene. When a search warrant was executed at the home of Singleton's wife, Farquhar located a box for a Smith & Wesson handgun, a loaded magazine for a 9mm handgun, and ammunition including 9mm bullets. He testified that the evidence found was consistent with the bullet that killed Carroll and the shell casing found at the crime scene. Singleton's wife testified that he was not living there at the time and that the handgun and other items had been stolen in October of 2013. Singleton contends that nothing is proven by the mere fact that his wife had ammunition that was similar to that used in the murder.
The evidence presented at trial was sufficient for the jury to conclude that Carroll was killed while Singleton was engaged in the attempted perpetration of an armed robbery. Singleton, Lynn, and Taylor went to Margaritaville Casino looking for a target to rob. Taylor befriended Luzader, and he invited her to his apartment. Taylor gave Singleton detailed directions to Luzader's apartment, provided him information *1283 about the apartment and Luzader's roommate, Carroll, and ensured that the apartment's front door was unlocked. Singleton entered the apartment armed with a gun and demanded money. A struggle ensued, and as Carroll opened his bedroom door, the gun discharged and Carroll was struck in the chest by a bullet.
Singleton argues on appeal that the evidence is insufficient to support his conviction based on inconsistent testimony and the lack of any physical evidence. However, all of the issues noted by Singleton were brought to the attention of the jury, and the jury chose to believe the testimony of the State's witnesses. This court does not assess the credibility of witnesses or reweigh evidence. Despite her inconsistent statements, as detailed above, Taylor consistently testified that Singleton entered the apartment and shot Carroll, and her testimony alone is sufficient to support Singleton's conviction. Further, Taylor's testimony was corroborated by the casino surveillance video, the cellphone tracking evidence of Lynn's phone, the text messages exchanged by Taylor and Singleton on the night of the murder, and Luzader's testimony.
Considering the evidence in the light most favorable to the prosecution, the evidence was sufficient for the jury to conclude beyond a reasonable doubt that Singleton was guilty of second degree murder. This assignment of error is without merit.
Motion for a continuance
Singleton next argues that the trial court erred in denying his request for a short continuance of trial. He maintains that the severing of Taylor's case and her testimony, along with the testimony of Lynn's witness Tamika O'Neal, substantially changed the expected course of the trial. He urges that he only sought a reasonable period of time to properly prepare for the changed nature of the case.
This case was set for trial on September 12, 2016. On August 15, 2016, the case came before the trial court for the perpetuation of Dr. Traylor's testimony, as he was going to be unavailable for trial. At that time, the state indicated that it intended to introduce the recorded statement of Shavez Taylor at trial and there was a discussion about whether severance was required. The trial court ordered that any briefs be filed by August 29, 2016, and that it would issue a ruling on August 31, 2016. Singleton's attorney questioned his availability, but consented to the setting as the trial court indicated that it would issue a written ruling. His attorney was not present on August 31, and the trial court issued a written ruling severing Taylor's case from Singleton's and Lynn's cases. This ruling was designated to be served on all counsel. On that date, Lynn filed a notice of alibi, listing six potential witnesses. These witnesses would allegedly testify that on the night of the incident, they were with Lynn at The Warehouse club, and that Lynn was dropped off at the house he shared with his girlfriend at around 3:00 a.m. The notice was not designated for service, but the State was provided a copy in open court.
On September 12, 2016, the case was called with all parties present, and the State announced ready for trial. The State indicated that it would first proceed to trial against Singleton and Lynn, and the parties agreed to a conference before jury selection. When Taylor's case was called, her counsel noted that although Taylor had rejected a plea offer, she would be testifying against Singleton and Lynn.
After the conference, counsel for Singleton filed a motion for continuance, requesting three additional weeks to prepare. He argued that there had been drastic changes since the last court appearance which impacted his presentation of a defense.
*1284 It was asserted that Taylor's case had been severed and the state intended to call her as a witness. That morning, during the conference, the State had provided counsel with a copy of the statement that Taylor had given to the district attorney (taken only three days earlier). Singleton's counsel claimed this statement had at least one major discrepancy from her prior statement. Specifically, in the prior statement, Taylor told police that she met Luzader by chance, and in the new statement, she indicated that Singleton directly introduced her to Luzader.
Singleton's attorney further requested a continuance on the grounds that he had just learned, in the conference, that Lynn had filed a notice of alibi, which he claimed would bear significantly on Singleton's case. Lynn's attorney acknowledged that he should have forwarded a copy of the notice to counsel for Singleton, and he joined in the motion for continuance. The trial court indicated that although defense counsel was not obligated to disclose trial strategy, the vague allegations of prejudice would be insufficient to warrant a finding of prejudice or conflict. Counsel for Lynn informed the trial court that one of his alibi witnesses could detrimentally affect Singleton's strategy and defense. The trial court denied counsel's request for an in camera hearing to explain how the alibi witness would impact the defense, and after conferring with Singleton, counsel declined to offer any concrete particulars or explain the alleged prejudice any further.
In a detailed written ruling, the trial court denied the request for a continuance, finding that neither the severance nor the alibi notice was of such a nature as to require the granting of a continuance filed on the day of trial. The trial court found that there is no right to a continuance when a severance occurs shortly before, or even at the time of trial. The trial court stated that defense counsel should have foreseen the possibility that one of the codefendants would cooperate with the state in an attempt to secure a deal or minimize his or her culpability. The court noted that the State indicated in 2014 and early 2015 that it intended to do so. Further, as to the alibi notice, the trial court noted that there is no requirement that counsel for a codefendant be served with such a notice under La. C. Cr. P. art. 727, and that counsel declined to allege a specific prejudice that would result from proceeding to trial in which some witnesses would allegedly place Lynn somewhere other than at the crime scene.
Singleton argues that Taylor's testimony is the only evidence placing the phone involved in the texts in his hand or him at the crime scene. Thus, he maintains it was incumbent on his trial counsel to be thoroughly prepared for her cross-examination, particularly in light of O'Neal's testimony, which implicated Singleton and exculpated Lynn. Further, Singleton contends that the trial court should have conducted an in camera hearing solely for the purpose of exploring the testimony expected from Lynn's witnesses and how it fit into the scheme of Singleton's defense.
In reply, the State argues that the trial court did not abuse its discretion in denying the request for a continuance, and that Singleton failed to establish any specific prejudice. The State notes that the record of Lynn's appeal reflects a level of cooperation between Lynn and Singleton. This cooperation was evidenced by an affidavit which Lynn unsuccessfully sought to have introduced at trial, wherein Singleton stated that he was with Lynn at the casino and then at a club, but that Lynn decided to stay at the club when Singleton left. Also, the State claims that defense counsel could have, and should have, anticipated that Taylor may decide to testify against Singleton and Lynn.
*1285 Upon a written motion at any time and after a contradictory hearing, the trial court may grant a continuance, but only upon a showing that such a motion is in the interest of justice. La. C. Cr. P. art. 707 ; State v. Thomas , 51,346 (La. App. 2 Cir. 6/21/17), 223 So.3d 759, writ denied , 2017-1264 (La. 3/9/18), 237 So.3d 523. Additionally, the court has discretion to grant a timely filed motion for a continuance "in any case if there is good ground therefor." La. C. Cr. P. art. 712. Because the decision to grant or deny a motion for continuance rests within the sound discretion of the trial court, a reviewing court will not disturb the trial court's determination absent a clear abuse of discretion. State v. Thomas , supra ; State v. Free , 48,260 (La. App. 2 Cir. 11/20/13), 127 So.3d 956, writ denied , 2013-2978 (La. 5/30/14), 140 So.3d 1174. Generally, a reviewing court will not reverse a conviction even on a showing of an improper denial of a motion for a continuance, absent a showing of specific prejudice. State v. Saulsberry , 52,031 (La. App. 2 Cir. 5/23/18), 247 So.3d 1137, writ denied , 2018-1067 (La. 11/05/18), 255 So.3d 1053 ; State v. Free , supra .
This Court found no abuse of discretion when the trial court denied the defendant's motion for a continuance in State v. Shaw , 27,892 (La. App. 2 Cir. 4/3/96), 672 So.2d 237. Shaw had been jointly indicted with two others for second degree murder. The State moved on the day of trial to sever a codefendant's trial after that codefendant requested the appointment of a sanity commission. Shaw then moved for a continuance when the severance was granted. Although Shaw claimed that the denial of a continuance prejudiced his defense because his attorney needed to change his trial strategy as a result of the severance, this Court found that Shaw's attorney failed to make a real showing of prejudice and was well-versed in the facts of the case.
In State v. Moore , 414 So.2d 340 (La. 1982), the defendant argued that his motion for a continuance should have been granted after his codefendants pled guilty immediately prior to trial because their pleas changed his trial strategy and caused him to testify. Noting that the pleas were not unexpected and that the codefendants' testimony against Moore was merely cumulative to the other evidence against him, the Louisiana Supreme Court concluded that Moore had not established any prejudice in the denial of a continuance.
We conclude that the trial court did not abuse its discretion in denying Singleton's motion for a continuance. As to the severance, it should have come as no surprise to Singleton that one of the codefendants would cooperate with the State in exchange for a plea deal. Taylor's statement to the police in 2014 implicating Singleton and Lynn was provided to the defense in discovery. In addition, that statement was substantially the same as her statement to the district attorney right before trial and her trial testimony. The defense was on notice that the State intended to introduce Taylor's statement, and should have anticipated that Taylor would testify against Singleton and Lynn. In cases involving multiple defendants, it is always a possibility that the instinct for self-preservation will trump the bonds of conspiracy.
Regarding the alibi notice, the notice was timely filed, and as noted by the trial court, there is no requirement that a codefendant be provided with a notice of alibi. Counsel for Singleton failed to explain how the alibi witnesses would detrimentally affect Singleton's defense. Further, as noted in this Court's prior appellate opinion, none of the six potential witnesses listed on Lynn's notice of alibi defense testified at trial. State v. Lynn , supra . Tamika O'Neal, while not an alibi witness, did testify on behalf of Lynn in an attempt to *1286 rebut Taylor's testimony. O'Neal was a former inmate who had been incarcerated with Taylor and knew members of Lynn's family. O'Neal testified that Taylor told her that Singleton left the casino to drop off Lynn at a club, and that she did not look at the intruders who burst into the apartment and only heard Singleton's voice.
Singleton failed to establish any specific prejudice as a result of the denial of the motion for continuance. Accordingly, this assignment of error is without merit.
Pro se assignment of error
Singleton contends that the trial court erred in accepting a bill of information amended from an indictment, where the amended bill did not pass before a grand jury.
On September 17, 2014, Singleton was indicted for second degree murder under La. R.S. 14:30.1. By amended indictment, on April 11, 2016, Singleton, Taylor, and Lynn were charged with second degree murder for killing Carroll during the attempted perpetration of an armed robbery under La. R.S. 14:30.1(A)(2).
Singleton argues that indictments can only be amended by the grand jury, and that because the district attorney amended the indictment without resubmitting it to the grand jury, he was effectively prosecuted under an amended bill of information, which is improper for the charge of second degree murder. Further, he claims that because the original indictment failed to provide the specific citation of the statute, this shows that the grand jury originally indicted him without all of the facts as to the elements of the offense.
The time for testing the sufficiency of an indictment or bill of information is before trial by way of a motion to quash or an application for a bill of particulars. State v. Draughn , 2005-1825 (La. 01/17/07), 950 So.2d 583, cert. denied , 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). A post-verdict attack on the sufficiency of an indictment should be rejected unless the indictment failed to give fair notice of the offense charged or failed to set forth any identifiable offense. Id. ; State v. Jones , 49,948 (La. App. 2 Cir. 09/30/15), 178 So.3d 1075. See also La. C. Cr. P. art. 841.
The district attorney also has full authority to amend bills of information and indictments, both as to form and substance, at any time before trial. La. C. Cr. P. art. 487 ; State v. Lyons , 50,556 (La. App. 2 Cir. 5/18/16), 195 So.3d 545 ; State v. Johnson , 49,985 (La. App. 2 Cir. 5/18/16), 196 So.3d 26.
Because there is no indication that Singleton objected to the amendment of the indictment prior to trial, he has arguably waived this claim. Nevertheless, even considering his claim, we find his claim to be without merit. The prosecution against Singleton was validly instituted by a grand jury indictment charging him with second degree murder. Under La. C. Cr. P. art. 487, the State had the authority to amend the indictment prior to trial, and the amendment simply clarified that Singleton was being prosecuted under the felony murder provision of La. R.S. 14:30.1. The amendment did not charge a new crime and the defense was aware of the allegation that the victim was killed during the attempted perpetration of an armed robbery. Singleton had full knowledge of the nature of the charges against him and he was not prejudiced by the amendment. This assignment of error is without merit.
CONCLUSION
Kinoy Singleton's conviction and sentence are AFFIRMED.
*1287 APPLICATION FOR REHEARING
Before Felicia Toney Williams, Daniel Milton Moore III, Frances Jones Pitman, James Mark Stephens, and Jay Bowen McCallum.
Rehearing denied.

Luzader estimated that he drank about eight beers before going to the casino, and then about 15 beers while at the casino.

All phone numbers mentioned in this opinion are from the 318 area code.

The testimony of Dr. James Traylor, who performed the autopsy, was perpetuated because he was unavailable to testify at trial.