Judgment rendered December 15, 2021.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 54,116-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

DENNIS DAVIS, JR.                           Appellant

* * * * *

Appealed from the
First Judicial District Court for the
Parish of Caddo, Louisiana
Trial Court No. 342,728

Honorable Charles G. Tutt, Judge

* * * * *

LOUISIANA APPELLATE PROJECT          Counsel for Appellant
By: Douglas Lee Harville

JAMES E. STEWART, SR.                 Counsel for Appellee
District Attorney

KODIE SMITH
ALEXANDRA L. PORUBSKY
Assistant District Attorneys

* * * * *

Before MOORE, GARRETT, and THOMPSON, JJ.

**MOORE, C.J.**

Defendant, Dennis Davis, Jr. ("Davis"), was charged with attempted first degree murder and armed robbery with a firearm enhancement. The court granted Davis's motion to proceed *pro se,* and he also waived his right to a jury trial. A four-day bench trial split over two months was held on October 1 and 2, 2019, and December 17 and 18, 2019, and presided over by the Honorable Charles Tutt. Following trial, the court found Davis guilty of armed robbery with a firearm enhancement and guilty of the responsive charge of aggravated battery. Sentencing was set for February 20, 2020.

Prior to sentencing, Davis filed several motions, including multiple motions for a new trial, a motion in arrest of judgment, and a motion for a post-verdict judgment of acquittal. Following a hearing on February 19, 2020, the trial court denied the motions; however, prior to his sentencing, Davis also filed a motion to recuse Judge Tutt on grounds of bias, prejudice, and a personal interest in his conviction.[1] Sentencing was delayed nearly eight months pending a hearing on this motion. After a hearing on the motion to recuse held before Judge Katherine Dorrah, the motion was denied on July 14, 2020. Sentencing was set for August 10, 2020, by Judge Tutt.

At the sentencing hearing, Judge Tutt sentenced Davis to 10 years at hard labor for the aggravated battery, and 20 years at hard labor without benefit of probation, parole, or suspension of sentence for the armed robbery conviction. The court ordered the two sentences to run concurrently

---

[1] Davis contends the motion was filed on February 18. Judge Tutt said he received it on the evening of the 19th, and the clerk said it was filed on the 20th. In any case, the motion precluded sentencing scheduled for February 20, 2020.

with each other and also concurrently with the felony sentence Davis was currently serving. For the firearm enhancement, the court sentenced Davis to five years without benefit of probation, parole, or suspension of sentence and ordered the sentence to be served consecutively to the 20-year armed robbery sentence.

This appeal followed.

**FACTS**

Around 2:00 a.m. on July 29, 2016, Davis approached Delbert Washington ("Washington"), an unarmed security guard for the Baymont Inn & Suites on Monkhouse Drive near the Shreveport Airport. Davis told Washington, who was standing outside the building, that he wanted to rent a room at the motel. Washington recognized Davis as a frequent customer over the past two years, and he accompanied Davis into the locked motel lobby. The front desk clerk, Jermaine Stephens ("Stephens"), informed Davis that there were no available rooms. Davis then asked if he could use the lobby telephone. After using the telephone, he pulled out a black handgun and fired it into the air. He demanded money from Stephens and shot Washington in the leg. Washington fled the building and called police. Davis took the motel cash drawer and fled the scene. Both Stephens and Washington said that Davis fired the pistol three times.

Washington identified Davis to the police as the person who committed the robbery and fired the shots. Both Washington and Stephens picked Davis out from a six-person lineup, and each identified him as the perpetrator in open court.

Three spent cartridge shell casings were found in the lobby area of the motel. A few days after the robbery, a black handgun was found in the

bushes in the same area where earlier police discovered the discarded empty cash drawer taken from the motel.

Davis was arrested and charged with attempted first degree murder and armed robbery. After a bench trial, the court returned a responsive verdict of aggravated battery on the murder charge, finding that Davis intentionally shot Washington in the leg. The court also found that Davis was guilty of armed robbery and the enhancement of armed robbery with a firearm.

On appeal, Davis's sole assignment of error alleges that the trial court abused its discretion by not ordering a second recess of the trial in order to obtain the presence of one of the defendant's witnesses. The witness whose testimony he seeks, a Leroy Graham ("Graham"), lived in Minnesota and refused to travel to Shreveport to testify in the trial. Graham, who was staying at the motel a few days after the shooting, saw a firearm near some bushes while he was walking his dogs. He reported what he saw and directed the police to the firearm. The following facts pertain to Graham's involvement in the matter.

On August 2, 2019, four days after the crime, Corporal Henry Burak of the Shreveport Police Department was dispatched to the Baymont Inn to follow up a report that a guest at the motel, Graham, had spotted a firearm in some bushes outside the motel when he was walking his dogs. Cpl. Burak testified that Graham directed him to some bushes located at the southwest corner right behind a Waffle House. Cpl. Burak saw a small black handgun in the bushes and retrieved the firearm. When Cpl. Burak was shown the handgun in court, he identified it as the same handgun he found at the Baymont Inn in the area where Graham directed him. He placed the firearm

3

along with an ATF trace form and other department paperwork in the property room.

Graham was initially issued a subpoena by the state to testify regarding finding the pistol while walking his dogs. However, the state later concluded that it did not need Graham's testimony to get the handgun into evidence since Cpl. Burak was the person who found it. There is no evidence that Graham ever touched or had custody of the gun. Nevertheless, Davis decided that he wanted to subpoena Graham, so he requested the court to issue a subpoena.

There was no return slip indicating Graham was served. However, Graham did call the Caddo Parish D.A.'s office regarding the subpoena. Kodie Smith, the prosecutor in this case, spoke with Graham on the telephone and advised him to contact Michael Enright at the IDB because he (Graham) was on the defendant's witness list; according to Enright, Graham never contacted him. Graham did not appear on October 1, 2019, for trial as directed by the initial subpoena. In fact, none of Davis's witnesses appeared on that date. The court advised the state and the defendant that it would keep the record open for Graham's testimony "if we can't get him here today, tomorrow, [or] before we finish trial." The court further stated: "And if he's the guy that supposedly found the gun, I personally want to hear from him."

The issue came up again on the second day of trial when, after cross-examining Cpl. Burak, the pro se defendant asked the court if it had made "any substantial steps to get Mr. Graham here." Judge Tutt responded: "I can't get on the phone and have him jump on a plane and come down here if he's refused to come down here. If he's not here, I told you we would see

4

what we could do to get him here *if necessary*." (Emphasis supplied). Since none of the witnesses that the defendant subpoenaed were present to testify, and Judge Tutt had no return slips to know who was not present and where they were located, he told Davis: "When the state finishes its case, I am going to go over your witness list with you and I'm going to try to see if we can get them here, okay."

At the end of the second day of trial, the court suggested that the state and defendant pick a future date to resume the trial. Judge Tutt stated he would allow Davis to issue new subpoenas to the local witnesses to appear on that future date. In the meantime, Judge Tutt said he would try to get in touch with Graham in Minnesota to find out if he was ever served and "see if we can get him here or at least get him on the telephone, okay."

The trial was set to resume on December 17-18, 2019. Because Davis appeared to be unprepared to cross-examine the state's witnesses, the court admonished him to "get ready to question your witnesses. * * * You've had four years to get ready."

Davis had submitted to the court a list containing 41 witnesses (pared down from at least 56) he wanted to subpoena for his defense. The court reviewed the list and ultimately approved 25 of the 41 requested subpoenas. Judge Tutt also wrote Davis a letter explaining his reasons for each one of the 16 witnesses he did not approve being subpoenaed.

On December 17, 2019, trial resumed. Davis complained that some of his witnesses were not present due to incorrect addresses. He also requested a continuance because he needed more time to prepare. Implicitly denying the motion, the court told Davis to call his first witnesses.

After Davis examined eight witnesses, he asked the court where Graham was, his out-of-town witness. The court replied that Graham was ordered by a judge in Minnesota on December 5 to be here, but he has not heard from him. The court then told Davis:

> All right. Mr. Davis, I don't know what the – I've done everything I humanly can. I and Chief Deputy Clerk Dianne Dougherty bothered the Minnesota authorities to death and finally got that subpoena served on the witness. He refused to voluntarily come. He went to court, and he was ordered to be here. I don't know what your remedy is because I've never been in this situation before.

Regarding Graham, Judge Tutt noted that the defendant had not given him any reason to try to have Graham arrested in Minnesota and brought here to testify. He asked Davis what testimony he expected to obtain from Graham to see if the state would stipulate to it. Davis responded that he wanted Graham to give an "account to his visit at the Baymont Inn, what type of people and activities that was[.]" Realizing where Davis was headed with this line of questioning, Judge Tutt stopped him, telling him that he had already shown, and the court had already acknowledged, that there were drugs and prostitutes and human trafficking all up and down Monkhouse Drive. Davis said he wanted to know if Graham met Washington, the security guard, while staying at the motel; he claims that Washington used drugs and was involved with prostitutes on Monkhouse Drive. He also wanted to ask Graham how he found the firearm, namely, how it was positioned or whether it was buried in the dirt.[2] The court concluded that the defendant had not given a sufficient reason to require Graham to testify regarding the position of the gun.

---

[2] On cross-examination of Cpl. Burak, the SPD officer who retrieved the gun from the bushes, Davis asked if the gun was buried, or covered in dirt; Cpl. Burak said it was not, but he could not say how long the gun had been there based on its appearance.

## DISCUSSION

By his sole assignment of error, Davis alleges that the trial court abused its discretion by failing to recess the bench trial to obtain the presence of Graham. Graham saw the firearm in some bushes around the motel while he was walking his dogs a few days after the offense. He reported what he saw and pointed Cpl. Henry Burak to the location where he saw the handgun. Cpl. Burak retrieved the firearm and placed it in the property room of the SPD.

Counsel for the defense argues that, although Davis was unable to supply to the trial court sufficient reasons for it to compel Graham's appearance, it was critically important to allow him to confront Graham since Graham inexplicably refused to comply with a court order to appear. Furthermore, it would have allowed the trial court to hear from a witness that the trial court previously said it wanted to hear from.

Counsel notes that neither the defendant nor the state would have been prejudiced if the court ordered a recess until Graham could be brought in to testify. Davis states he was not being held in jail on the instant charges, but rather for another felony offense, and the state had already rested its case. Therefore, Davis argues that his convictions should be reversed, the sentences vacated, and the matter remanded for further proceedings.

The state contends that Davis never requested or filed a motion for a recess, which would also be the second recess granted by the court to obtain the appearance of Graham. Furthermore, Davis offered only conjecture and hypotheses regarding what facts to which Graham might testify. The state further argues that Davis never requested the court to recess or continue trial at a later date. He asked the court to issue writs of attachment to each of the

7

witnesses who were subpoenaed and not present on December 17. The court went through each witness with Davis to determine if their testimony was relevant or would aid in his defense. After considering the testimony Davis expected to obtain from each of the missing witnesses, the court issued writs of attachment to two of them, not including Graham. The defendant did not object to the court's refusal to issue a writ of attachment for Graham. The state contends that Davis's failure to object to the trial court's failure to issue a writ of attachment for Graham, and his failure to move for a recess, renders the assignment of error meritless.

Counsel argues that this court has construed ambiguous statements by an attorney as an oral motion for a continuance or recess, citing *State v. Ford,* 42,928 (La. App. 2 Cir. 2/13/08), 976 So. 2d 321, *writ denied*, 08-0605 (La. 10/3/08), 992 So. 2d 1010. Since Graham was an out-of-state witness, obtaining his presence would have required a recess. Counsel argues that Davis should not be deprived of questioning Graham simply because he did not utter the correct words.

The decision to grant or deny a motion for continuance rests within the sound discretion of the trial court and a reviewing court will not disturb the trial court's determination absent a clear abuse of discretion. *State v. Brown*, 52,501 (La. App. 2 Cir. 1/16/19), 264 So. 3d 697, *writ denied*, 19-0297 (La. 6/3/19), 272 So. 3d 892; *State v. Free*, 48,260 (La. App. 2 Cir. 11/20/13), 127 So. 3d 956, *writ denied*, 13-2978 (La. 5/30/14), 140 So. 3d 1174.

A defendant must satisfy the three-pronged test in La. C. Cr. P. art. 709 to obtain a continuance or recess based upon an absent witness. The statute reads:

A. A motion for a continuance based upon the absence of a witness shall state all of the following:

(1) Facts to which the absent witness is expected to testify, showing the materiality of the testimony and the necessity for the presence of the witness at the trial.

(2) Facts and circumstances showing a probability that the witness will be available at the time to which the trial is deferred.

(3) Facts showing due diligence used in an effort to procure attendance of the witness.

In *State v. Ray,* 42,096 (La. App. 2 Cir. 6/7/07), 961 So. 2d 607, the trial court denied the defendant's second motion to recess trial (after granting the first recess motion) due to the absence of three of his witnesses who were subpoenaed. The trial court initially recessed trial for several weeks to allow the defendant a chance to get the witnesses. When trial resumed, only one of the subpoenaed witnesses showed up. After the court confirmed that the witnesses had been served, it denied the request for a recess. On appeal, this court affirmed the trial court decision finding no abuse of discretion because the defense failed to show that the absent witnesses' testimony was material, or show that they would be available at a later date.

In this case, the defendant could not articulate material facts to which Graham would testify that would aid in his defense. Davis did not show that the trial court could even get Graham to Louisiana to testify. Finally, it was the court, not the defendant, who made a diligent effort to get Graham to Shreveport, even going so far as to call the clerk in Minnesota several times resulting in a judge ordering Graham to obey the subpoena.

We further note that our review of this voluminous record reveals that the trial court considered all the defendant's 180-plus motions and

9

maintained commendable patience with him throughout all hearings and trial proceedings. In addition to the numerous motions, Davis made several writ applications to state and federal courts, and alleged numerous conspiracies against him by the district attorney's office, the trial judge, the victims, the witnesses, and others.

Regarding the testimony of Graham, the court initially expressed a desire to hear his testimony since it appeared that he "found" the gun. However, as the facts of the case came out at trial indicating that Graham simply saw the gun in the bushes and led police to it, his testimony was not critical. Additionally, Davis failed to show that Graham's testimony would aid in his defense of the charges, since two witnesses identified him as the armed robbery and shooter. As the state argues, the crux of the defense is whether Davis was the perpetrator of the crime. This fact was not established by the handgun, but rather by the security guard and front desk clerk, each of whom independently identified the defendant as the shooter and armed robber. No fingerprints connected Davis to the gun; however, the empty cartridge casings found by police in the motel lobby from the shooting connected the handgun to the crime.

We therefore conclude that the trial court did not abuse its discretion by not recessing trial a second time on its own motion because Graham did not respond to the subpoena. Clearly, as the facts of the case unfolded, it became clear that Graham's testimony was not necessary for the defendant's defense, inasmuch as neither Davis, nor his stand-by counsel, could articulate how Graham's testimony would aid in his defense. Davis failed to show that he was prejudiced. Additionally, there was no assurance that

Graham would be available to testify at a future date. Accordingly, this assignment is without merit.

## ERROR PATENT REVIEW

Our error patent review reveals a discrepancy between the sentencing transcript and the minute entry regarding the sentences imposed. The transcript shows that the trial court sentenced Davis to 10 years at hard labor for the aggravated battery conviction and 20 years at hard labor for the armed robbery conviction, the latter conviction to be served without benefit of probation, parole, or suspension of sentence. Additionally, the court ordered the sentences to be served concurrently with each other and any other sentence the defendant was currently serving. However, the minute entry mistakenly reverses the years and manner of serving the sentences by incorrectly stating that the defendant was sentenced to 20 years at hard labor for aggravated battery without benefit of probation, parole, or suspension of sentence, and 10 years at hard labor for the armed robbery.

La. C. Cr. P. art. 871(A) requires that a "[s]entence shall be pronounced orally in open court and recorded in the minutes of the court." When there is a discrepancy between the minutes and the transcript, the transcript prevails. *State v. Lynn*, 52,125 (La. App. 2 Cir. 8/15/18), 251 So. 3d 1262, *writ denied*, 18-1529 (La. 4/15/19), 267 So. 3d 1129. Accordingly, we order that the August 10, 2020, minute entry be amended to reflect that the defendant was sentenced to 10 years at hard labor for the aggravated battery conviction and 20 years at hard labor without benefit of probation, parole, or suspension of sentence for the armed robbery conviction.

We note that the minute entry correctly reflects the sentencing transcript regarding the armed robbery penalty enhancement in which Davis

11

was sentenced to five years at hard labor without benefit of parole, probation, or suspension of sentence to be served consecutive to the concurrent sentences already imposed. The court also ordered that the minutes reflect that the armed robbery was a crime of violence described in La. R.S. 14:2(3).

Further, we hereby correct the court's omission of the word "conviction" in the sentencing court's notice to the defendant of the time limitations for post-conviction relief. The defendant has two years from the date his *conviction* and sentence are final to apply for post-conviction relief.

## CONCLUSION

For the reasons stated hereinabove, we conclude that the trial court did not abuse its discretion by failing to call a recess a second time when one of Davis's out-of-state witnesses did not appear to testify. Accordingly, we affirm the defendant's conviction and sentence.

**CONVICTION AND SENTENCE AFFIRMED.**